2015 BNH 005

---

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW HAMPSHIRE

In re:                                                            Bk. No. 11-13664-JMD
                                                                  Chapter 11
Ezenia! Inc.,
         Debtor


Ezenia! Inc.,
         Plaintiff

v.                                                                Adv. No. 12-1102-JMD

Khoa D. Nguyen &
Phuonglan T. Nguyen,
         Defendants

*Curt Roy Hineline,*
*Bracewell & Giuliani LLP*
*Seattle, WA*
*&*
*Daniel W. Sklar*
*Nixon Peabody LLP*
*Manchester, NH*
*Attorneys for the Plaintiff*

*Charles R. Powell, III*
*Devine, Millimet & Branch, PA*
*Manchester, NH*
*Attorney for the Defendants*


## MEMORANDUM OPINION

## I.  INTRODUCTION

On January 30, 2012, Khoa D. Nguyen and his wife, Phuonglan T. Nguyen, (collectively

"Nguyen") each filed proofs of claim against Ezenia! Inc. (hereinafter the "Debtor" or "Ezenia")

(PoC 18 and PoC 17).  On August 29, 2012, the Debtor filed an objection to both claims (Bankr.

Doc. No. 223)[1] and Nguyen responded (Bankr. Doc. No. 227).  Because the resolution of the

objection appeared to involve complicated factual circumstances and various employment

contract claims, the Court ordered that the contested matter be converted to an adversary

proceeding.  See Order dated October 2, 2012 (Bankr. Doc. No. 232).  The Court conducted a

trial on the complaint over twenty days beginning in January 2014 and continuing through to

October 2014.[2]  The Court also has before it three competing motions for sanctions that Ezenia

and Nguyen filed against each other for alleged discovery abuses.[3]  Both the claims objection

and sanctions motions are addressed in this memorandum opinion.

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§

1334 and 157(a) and Local Rule 77.4(a) of the United States District Court for the District of

New Hampshire.  This is a core proceeding in which this Court may enter final orders.  28

U.S.C. § 157(b); Katchen v. Landy, 382, U.S. 323, 330 (1966).[4]

---

[1] "Bankr. Doc. No." references docket entries in the main bankruptcy case, In re Ezenia!, Inc. (Bk. No. 11-13664-JMD). Otherwise, references to "Doc. No." are to docket entries in this adversary proceeding.

[2] The trial dates in the adversary proceeding were as follows (all dates in 2014): January 22 - 24, February 19 - 20, March 25 - 27, April 17- 18, May 28 - 29, June 26, 27, 30, July 1, September 3 - 5, October 22.

[3] The Court began taking evidence on the sanctions motions before the beginning of the trial proper.  One pre-trial evidentiary hearing was held on Ezenia's motion for sanctions on November 21, 2013, but the parties did not finish presenting evidence before the end of the hearing.  When the trial commenced, the Court permitted them to present further evidence on the sanctions motions during the trial on the complaint.

[4] If it is determined that this Court may not enter final orders, the district court may treat this opinion as proposed findings of fact and conclusions of law, and conduct a de novo review before entering a final order.  Executive Benefits Ins. Agency v. Arkison, 134 S.Ct. 2165 (2014).

2

## II. FACTS

### A.     Background and Events Leading to Nguyen's Resignation

Nguyen's claims and the Debtor's objection center around an employment agreement (the "Employment Agreement") between the Debtor and Nguyen, its former Chief Executive Officer and Chairman of the Board of Directors (the "Board"). At base, the dispute is simple; Nguyen claims that he resigned on account of an adverse change in his employment status, triggering contractual severance benefits. The Debtor counters that no change in status occurred and it owes Nguyen no severance. This simple-sounding dispute implicates a broad cast of characters and over a year of corporate history, much of which the parties recounted in extraordinary detail during the twenty days of trial time in this proceeding. Before delving into the details, it is necessary to have a firm grasp on who the parties are and how they fit into the events that lead up to Nguyen's resignation.

In this case, prior to August 31, 2010, the term "management" is essentially interchangeable with Khoa Nguyen. Beginning in 1997, Nguyen joined the Debtor—then called Video Server, Inc.—as Executive Vice President. Less than a year later, Nguyen had ascended to the roles of President, Chief Executive Officer, and Chairman of the Board. His duties and responsibilities were first set down in an employment agreement in 1999. This agreement was amended in 2007 and remained in effect until Nguyen's resignation in 2011.

Ezenia is a publicly-traded company that develops and maintains secure communication and collaboration software, mainly for various federal government agencies. The Debtor had two different versions of this software, InfoWorksSpace ("IWS") and MxM. IWS was the centerpiece of the Debtor's business, the software which the Debtor licensed and supported.

3

MxM was software in development that was slated to replace IWS before the Debtor ran into financial trouble.  During more successful times, Ezenia had hundreds of employees and offices in multiple states.  By 2010-2011, it had downsized significantly and had around 20 employees and one main location in Nashua, New Hampshire.

Nguyen lead the Debtor continuously from 1998 until he experienced a personal tragedy in June of 2010.  From his testimony and the other evidence introduced at trial, it is evident that Nguyen felt a deep, personal commitment to and responsibility for Ezenia.  The Debtor's employees unanimously praised Nguyen's dedication and work ethic, citing his habit of often working into the early morning hours.  Nguyen viewed Ezenia as not just a job that provided him with a financial benefit, but as an enterprise for which he was personally responsible, both in success and failure.

This strongly-felt personal responsibility and dedication to the enterprise were likely major factors in Nguyen's hostility when, in 2009, North & Webster, LLC ("North & Webster")—a minority shareholder of Ezenia, partly owned by activist investor Sam Kidston—began agitating for radical change.  At the time, Ezenia was not on solid financial footing.  It was losing cash and hopes of its survival without significant new investment looked dim, and at least some Board members were in favor of liquidating the company.  Kidston became involved with the Debtor with the express purpose of increasing the company's value, either via liquidation or some type of merger transaction.  To this end, Kidston made several demands.  One of these was for the installation of a number of new Board members, a process over which North & Webster would have some direct control.

Nguyen and the rest of the Board clashed over Kidston's demands. Some Board members were in favor of granting his demands, either because they agreed with his goals or because they wanted to avoid an expensive and potentially damaging proxy fight. Nguyen threatened to resign if Kidston joined the Board, calling Kidston and North & Webster nothing but "corporate raiders." Nguyen was afraid that Kidston would come in and unfairly benefit from his years of labor on Ezenia's behalf, while destroying the company in the process.

This fight continued through the first six months of 2010. By June of that year, the Board was actively negotiating a settlement agreement with North & Webster that would see Kidston join the Board if management was not able to attain certain financial goals by January of 2011. Nguyen remained staunchly opposed.

In mid-June, Nguyen experienced a personal family tragedy when his daughter unexpectedly passed away. Nguyen immediately departed Nashua to be with his family in Texas, leaving the rest of the management team to handle the upcoming annual shareholder meeting without his leadership. At the same time, the Board met on June 21, 2011 and voted 3-1 to approve the settlement agreement with North & Webster. When Nguyen found out about the Board vote, he was furious, but there was nothing he could do. As required by the settlement agreement, two new members joined the Board, both outside directors, Larry Snyder and Pete Janke.

Nguyen missed the next three Board meetings, as he grieved for his daughter. He attended the August 31, 2010 Board meeting, however, and announced that he was stepping down as President and turning over day-to-day operations of Ezenia to the new Board member, Pete Janke. Ostensibly, this change in leadership was because of Ezenia's financial situation and

Janke's proven ability to turn around distressed companies.  In private, Nguyen confided to Janke that his heart simply was not in the right place to lead Ezenia—he was still consumed with grief over his daughter's passing.  The other evidence in the record, including the testimony of the other directors, shows that this was tacitly understood by all the directors.  The Board approved Nguyen's decision to turn operations over to Janke in a vote of 5-1.  Janke was officially hired as the President and Chief Operating Officer, effective immediately.  Janke's directives were to hire an investment banker and begin preparing the company for a transaction that could preserve some of its value, through sale, acquisition, or merger.  From this point onward, Janke presided over Board meetings in Nguyen's place, despite Nguyen still retaining the official titles of Chairman and CEO, and continuing to attend board meetings.

In January of 2011, Ezenia had failed to meet the financial goals set out in the North & Webster settlement agreement, and under the terms of the settlement agreement, Kidston was entitled to a seat on the Board.  At this time, the Board was composed as follows: (1) a group of three long-standing outside directors with no clear plan for Ezenia's future, but who at least apparently were willing to follow management's lead for a little while longer; (2) George Stevens, another outside director, who had joined the Board in 2009 at Nguyen's request because of his experience with distressed companies; (3) Larry Snyder, a friend of Stevens, who joined the Board in June 2010 as an outside director; and (4) the management-side directors, Janke and Nguyen.

At the time Kidston was about to join the Board, in January 2011, Stevens and Snyder had become extremely displeased at management's failure to engage an investment banker and make demonstrable progress in formulating a turn-around strategy; Janke had been President and

COO for six months, and the tasks that should have been accomplished in weeks were yet incomplete.  In their minds, Janke had not done the job he was brought on to do and had simply continued to follow Nguyen's lead of maintaining the status quo—the status quo being the continued development of MxM, the maintenance of the current IWS customer base, and the generation of new IWS business.  They did not have confidence in the financial reports management was giving them.  They thought the company was actually in much worse financial condition that either Janke or Nguyen reported.  Another issue was the three long-standing directors.  Stevens and Snyder distrusted them, feeling that conflicts of interest prevented the group from objective decision-making.  Ultimately, Stevens and Snyder wanted the entire group to resign.

Janke and Nguyen took a different position than Stevens and Snyder.  Both thought that the software in development, MxM, had value but needed several more months before it could be useful in a deal and wanted to give the engineering team the time it needed to make MxM's value readily apparent to any prospective transactional partner.  They were ultimately in favor of preserving the core of Ezenia's business by keeping their current customer base and making use of MxM.  They thought that rushing into a transaction was a mistake that would end up costing the shareholders a valuable piece of technology.  The essence of their disagreement with Stevens and Snyder was over (1) the value of the MxM and IWS software and (2) the speed at which a transaction needed to happen.  Nguyen felt that he understood Ezenia's business better than Snyder or Stevens, who were relative newcomers in his eyes and lacked a deep understanding of the technology and customer base.  Janke shared Nguyen's opinion, although it is unclear whether this was out of deference to Nguyen, or his own independent conclusion.

Kidston joined the Board at the end of January and landed in the Stevens-Snyder camp. This affiliation appears to have been one born more of exigency rather than innate trust or careful planning. Stevens and Snyder simply agreed with Kidston that radical changes needed to happen—with all possible haste—to preserve any of Ezenia's remaining value. During the Board meetings that took place from January through March of 2011, a pattern emerged: management continued to make no immediate progress on finding a transaction partner, Nguyen continued to make sales trips and presentations, reporting his efforts to the Board. Both management and the Board seemed to agree that Ezenia lacked the cash for continued development of its next generation MxM software.

In early March, the Board held a final meeting before the tipping point. During this meeting, the Board decided that outside directors Kidston and Stevens would work with President Janke to find ways to reduce spending. This goal of reducing spending was a way to buy the company more time to find a transaction partner, not a feasible long-term strategy, and the whole Board appeared to know it. At the conclusion of this meeting, the Board resolved to do all it could to find a way to make a transaction happen.

The rift between the Board and management continued to widen. Several days after the early March Board meeting, the group of three long-standing, outside directors abruptly resigned for reasons that are not clear. At roughly the same time, Kidston, Stevens, and Snyder found a potential transaction partner, a company called ArX Mobile ("ArX"). At their request, Janke signed a non-disclosure agreement so that the two companies could exchange information to ascertain whether some kind of a deal would be mutually profitable. Several days later, the president of ArX asked Janke to sign a non-binding letter of intent ("LOI") that would be the

8

next step in exploring a transaction.  Janke refused to sign the LOI, arguing that it was premature since he had not met with anyone from ArX.  The outside directors were not surprised at Janke's refusal, and director Kidston signed the LOI instead.

At the end of March, things came to a head.  Apparently, Janke's refusal to act on the LOI had been the last straw for the remaining outside directors.  At the April 1, 2011 Board meeting, they voted to terminate Janke's employment.  They also voted to ratify Kidston's signing of the ArX LOI, which would allow discussions of a possible transaction to move forward.  Nguyen strongly opposed both of these measures, claiming that the Board's actions diminished his authority as CEO and Chairman of the Board, triggering the severance provision in the Employment Agreement.  First, he argued that he should have been more involved in the decision to terminate Janke and that as CEO such a decision should ultimately be his.  He thought that terminating Janke was wrong for the company and would undermine the work Janke had done since joining Ezenia.  Second, he felt that the ArX transaction would be unfavorable and that MxM could be saved—there was a future for Ezenia without rushing into an unwise transaction that would gut the company.

After terminating Janke and ratifying the ArX LOI, the Board voted on two other matters.  First, the Board would retain a law firm to advise it concerning Nguyen's employment contract, since he had formally asserted a change in status.  Second, the outside directors expressed a lack of understanding regarding what was happening inside Ezenia, including its immediate financial condition.  The Board voted to have Kidston's firm, North & Webster, visit Ezenia's office to afford the Board some direct information on what was happening.  Nguyen and Janke also opposed these measures, but were again outvoted.

9

Over the next two months, the outside directors and Nguyen attempted to reach a settlement that would result in Nguyen's departure from Ezenia on terms agreeable to both sides. During this time, the outside directors continued to explore transactions for Ezenia and hold Board meetings. Nguyen attended only two more Board meetings, but did not take a leadership role. At one of the meetings he attended, he reported on sales trips that he had made. Around the same time he stopped attending board meetings, Nguyen announced via email his decision to stop coming into the office, citing his imminent departure. Sometime in May, Snyder visited Ezenia personally, again to help the outside directors understand what was going on in the company. Nguyen was not present during Snyder's visit. Nguyen finally resigned on June 8, 2011, after settlement discussions broke down. After Nguyen's resignation, Snyder was appointed CEO and Kidston became Chairman of the Board. In September 2011, the company filed chapter 11 and this litigation ensued.

### B.      Elements of Nguyen's Claims

Although the central issue of the claims objection is Nguyen's claim for severance benefits under the Employment Agreement, Nguyen's claim contains other elements that are based on entirely separate facts. The Court will address each element of Nguyen's claim in turn, starting with the largest claim for severance benefits. At trial, Nguyen amended and waived some elements of his claim. For the sake of clarity, the Court lists below each element of Nguyen's claim in its most current form.

*1)  Severance Benefits Under the Employment Agreement*

Nguyen's claim for severance benefits derives from the language of the Employment Agreement[5] that was in effect at the time of his resignation.  The Employment Agreement provides that if Nguyen resigned on account of a "Change in Status"—as defined in the Employment Agreement, see infra—he would receive two times his annual base pay of $285,000 in monthly installments over two years and lifetime medical and dental insurance coverage.  See Employment Agreement, §§ 2.1, 2.2.  The lifetime medical and dental insurance provision also covers Mrs. Nguyen and provides the sole basis for her claim.  See PoC 17.  During the trial, Nguyen and the Debtor disputed whether Mrs. Nguyen's claim was already included as part of Mr. Nguyen's claim.[6]  Because it is unclear to the Court whether Nguyen ultimately agreed that the entirety of Mrs. Nguyen's claim was duplicated by his own claim, the Court shall address her claim below.

Nguyen has agreed that his claim for severance benefits is limited by the provisions of the Bankruptcy Code[7] to the severance benefits he would have received within one year of the

---

[5] The Employment Agreement is Exhibit 130 and became effective during 2007, amending the previous employment agreement between Nguyen and the Debtor.

[6] In his closing brief, Nguyen only included one damages amount for medical and dental benefits, encompassing the amounts owed to him and Mrs. Nguyen.  See Nguyen Omnibus Br., 33.

[7] 11 U.S.C. § 502(b)(7) provides:

Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that–
(7) if such claim is the claim of an employee for damages resulting from the termination of an employment contract, such claim exceeds--

date of his termination.  <u>See</u> Nguyen Omnibus Br. at 33.  Accordingly, he is claiming $285,000 of base pay and $16,800 in damages for medical and dental insurance benefits.  The medical and dental insurance claim breaks down into $1,300 monthly for medical insurance and $100 monthly for dental insurance for one year.  Nguyen has measured damages by the amount of the premium he would have paid: $1,300 is the monthly premium he would have paid for health insurance per month under the severance agreement;  $100 is the monthly premium for dental insurance.

### 2) *Deferred Compensation*

Nguyen entered into the Deferred Compensation Plan (the "Plan") with the Debtor years before the petition date.  Under the Plan, he agreed to defer the receipt of $180,000 worth of his salary.  The Debtor placed the deferred salary amount into a so-called Rabbi Trust (the "Trust").  In turn, the Debtor directed the Trust's assets to be placed into various investment vehicles.  The actual amount Nguyen was entitled to receive under the Plan would fluctuate based on the performance of the investments.

Under the terms of the Plan, Nguyen elected to receive all of his deferred compensation in a lump sum on the first day of the calendar year following the date of his separation from Ezenia. Accordingly, but for the bankruptcy filing, Nguyen would have been entitled to receive

---

(A) the compensation provided by such contract, without acceleration, for one year following the earlier of--
(i) the date of the filing of the petition; or
(ii) the date on which the employer directed the employee to terminate, or such employee terminated, performance under such contract; plus
(B) any unpaid compensation due under such contract, without acceleration, on the earlier of such dates. . . .

his deferred compensation on January 1, 2012.  Post-petition, the Debtor revoked the Trust and placed the former Trust-assets into its general operating account.

In an order granting in part Nguyen's motion for judgment on the pleadings, the Court has ruled that Nguyen is entitled to deferred compensation.  In the order, the Court reserved the issue of the amount of deferred compensation for determination at trial.  See December 12, 2013 Order (Doc. No. 76).  At trial, Nguyen amended the deferred compensation portion of his claim to $270,000 to reflect the hypothetical value the Trust would have had if the Debtor had not liquidated it.  The claim for $270,000 is as of August 2014.

### 3)  Federal Income Tax Damages

In his proof of claim, Nguyen asserts that he is entitled to damages against the Debtor as a result of the Debtor withholding improper amounts from his paychecks for tax years 2007 and 2008 and improperly filling out Form W2 submitted to the Internal Revenue Service for those same years.  Nguyen is not seeking reimbursement for the additional taxes he incurred, but only for the interest he had to pay when he submitted corrected tax returns, in the amount of $5,538.35, and accountant's fees of $2,000.  Nguyen asserts his claim for damages under the Internal Revenue Code and IRS regulations.

### 4) Stock Options

Another part of Nguyen's filed proof of claim relates to stock options.  At trial, Nguyen orally amended his proof of claim to withdraw the amounts related to stock options.  See Trial Record, 9/5/2014.  Accordingly, the Court considers this aspect of the claim waived.

### 5)  Bonus

Likewise, as originally filed, Nguyen's proof of claim asserted a claim for a bonus due under the Employment Agreement.  This aspect of the claim was explicitly waived during closing arguments.  See Trial Record, 10/22/2014.

C.    Applicable Law

Because this is ultimately the Debtor's objection to each remaining element of Nguyen's proof of claim, the standard burden-shifting framework applies.  Proofs of claim that are filed in accordance with Bankruptcy Rule 3001 are, in effect, presumed to be valid.  Bankruptcy Rule 3001(f) ("A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim.").  As a preliminary matter, the Court finds that Nguyen's claim comports with Rule 3001 and is entitled to the presumption of validity.  If a party in interest objects to a proof of claim, that party bears "the initial burden of producing substantial evidence" to overcome the presumption of validity a properly executed proof of claim is otherwise entitled to.  Juniper Dev. Group v. Kahn (In re Hemingway Transp. Inc.), 993 F.2d 915, 925 (1st Cir. 1993).  Once the objector meets the burden of substantial evidence, the claim-filing creditor bears "the ultimate risk of nonpersuasion as to the allowability of the claim."  Id.  Ultimately, the creditor must demonstrate, by a preponderance of the evidence, that the claim is entitled to allowance.  See, e.g., American Express Bank v. Askenaizer (In re Plourde), 418 B.R. 495, 504 (B.A.P. 1st Cir. 2009) ("If the objection is substantial, the claimant 'is required to come forward with evidence to support its claims . . . and bears the burden of proving its claims by a preponderance of the evidence.'") (quoting Tracey v. United States (In re Tracey), 394 B.R. 635, 639 (B.A.P. 1st Cir. 2008)).

As the foregoing factual summary should make apparent, the parties have put forward a considerable amount of evidence to support their respective positions.  Given this evidence, the Court finds that on each of the three remaining elements of Nguyen's claim (severance benefits, deferred compensation, and tax damages), the Debtor has successfully put forward the necessary "substantial evidence" to place the burden of persuasion back onto Nguyen.  Accordingly, Nguyen now must demonstrate that his claim ought to be allowed, satisfying the preponderance of the evidence standard.

## III.  DISCUSSION

### A.    Change In Status

The largest component of Nguyen's claim regards the amount of severance payments. Nguyen's severance claim is only valid if he resigned on account of a change in status; if Nguyen did not resign on account of a change in status, then his claim for severance is not allowable.  Determining whether Nguyen resigned on account of a change in status is a three-step process.  This process begins with the interpretation of the Employment Agreement, moves to ascertaining what Nguyen's position and responsibilities at Ezenia were during the spring of 2011, and ends with an assessment of how, if at all, his position and responsibilities changed during that time.

Interpretation of the Employment Agreement is a question of law.  The Employment Agreement contains a choice of law clause, which states that Massachusetts law governs the interpretation of the agreement as a whole.[8]  The parties have not objected to the Court enforcing

---

[8] Ex. 130, Employment Agreement, 13, § 9.5.

the choice of law clause.  Indeed, each party cited Massachusetts case law exclusively in their closing memoranda.[9]  Accordingly, the Court shall look to Massachusetts law in interpreting the terms of the Employment Agreement.

In Massachusetts, contract interpretation is a question of law.  GMAC Mortg., LLC v. First American Title Ins. Co., 464 Mass. 733, 737 (2013); Suffolk Constr. Co., Inc. v. Lanco Scaffolding Co., Inc., 47 Mass. App. Ct. 726, 729 (1999).  "Contracts that are free from ambiguity must be interpreted according to their plain terms."  Suffolk Constr. Co., 47 Mass. App. Ct. at 729.  A contract provision that is "'not susceptible to more than one meaning is unambiguous.'"  Prozinski v. Ne. Real Estate Servs., LLC, 59 Mass. App. Ct. 599, 605 (2003) (quoting Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998)).

Under the Employment Agreement, a change in status is defined as follows:

> A "Change in Status" of the Executive shall mean the occurrence, without the Executive's written consent, of any of the following circumstances (unless such circumstances constitute an isolated, insubstantial and inadvertent action not taken in bad faith and are promptly and fully remedied by the Company after receipt of notice thereof by the Executive): (a) **any diminution or change in a manner adverse to the Executive** of **(i) his title, office or position with the Company**, (ii) his salary, bonus, or other benefits, or **(iii) his duties, responsibilities or employment condition**, (b) any breach of this Agreement, including without limitation, the failure by the Company to pay to the Executive any portion of his compensation or other benefits, (c) the Company's requiring the Executive to be based at any office or location more than 35 miles from the Company's current main office or the Company's requiring the Executive to travel on Company business to a substantially greater extent  than required immediately before the date of this Agreement, or (d) any purported termination

---

[9] Nguyen noted that, while New Hampshire law could also potentially apply to the Employment Agreement, he would cite exclusively to Massachusetts law given that the law of both jurisdictions does not materially differ in any respect relevant to the interpretation of the agreement.

by the Company of the Executive's employment otherwise than as expressly
permitted by this Agreement (emphasis added).[10]

Nguyen claims that he experienced adverse changes regarding both his title, office, and position

and his duties, responsibilities and employment condition, implicating violations of both (a)(i)

and (a)(iii) of the Employment Agreement.  Accordingly, for the purpose of this proceeding, a

"Change in Status" is the occurrence, without Nguyen's consent, of any diminution or change in

a manner adverse to his title, office or position, or his duties, responsibilities or employment

condition.  In the event of a Change in Status, Nguyen is entitled to resign and receive

severance.[11]  Specifically, Nguyen must "resign[] his employment on account of" the Change in

Status.[12]  The parties did not argue that any of these contractual provisions were ambiguous.  The

Court likewise does not find these provisions to be ambiguous and will afford the terms

contained in them their plain meanings.

Nguyen's job titles and responsibilities are defined in the Employment Agreement.

Section 1.1 states:

> The Company shall employ the Executive in the position of Chairman, President
> and Chief Executive Officer, as such position has been defined in terms of
> responsibilities and compensation as of the effective date of this Agreement;
> provided, however, that the Board shall have the right, at any time prior to the
> occurrence of a Change in Control, to revise such responsibilities and
> compensation as the Board in its discretion may deem necessary or appropriate,
> subject to the other provisions of this Agreement.

Section 1.1 does not attempt to clearly limit Nguyen's responsibilities at Ezenia, rather it refers

to the "responsibilities" of the Chairman, President, and CEO "as of the effective date" of the

---

[10] Ex. 130, 8, § 5.1.

[11] Id. at 3, §§ 2.1, 2.2.

[12] Id., at § 2.1.

Employment Agreement.  Ezenia's Board is also permitted to change Nguyen's responsibilities freely.  The Board's ability to alter Nguyen's responsibilities is "subject to the other provisions" of the Employment Agreement.  The other provisions relevant here are the provisions relating to Change in Status and severance.  Accordingly, the Employment Agreement did not contemplate a rigid, unchanging definition of duties and responsibilities.  Rather, it contemplated a more dynamic situation where those duties and responsibilities could change over time.  Such gradual changes could not be "adverse" to Nguyen, but could occur at his direction or, absent coercion, with his agreement or acquiescence.  The Court must examine the factual evidence and discern what Nguyen's responsibilities were in order to determine whether the Board diminished or changed them in such a way that would result in a Change in Status.

As described above, for Nguyen to resign on account of a Change in Status and remain eligible for severance, two conditions must be satisfied under the Employment Agreement.  First, an event that amounts to a Change in Status must actually occur.  Second, Nguyen must have resigned on account of that Change in Status.  This second item implies causation.  It requires Nguyen's resignation to have been caused by the Change is Status he complains of.  He cannot have resigned for some other reason.  The Court shall examine the entire record as a whole to determine whether both the first and second conditions are satisfied for each of Nguyen's separate Change in Status claims.  In other words, the Court cannot simply accept Nguyen's assertion that he resigned for the reasons he claims; it must examine all of the evidence in the record to gauge support for those assertions.  Nguyen's testimony is only a portion of that evidence.

Nguyen claims that a number of specific actions of the Board caused a Change in Status and that any one of those Board actions was sufficient in and of itself to permit him to resign with severance.  The Court will address each of those claims separately.  Accordingly, based on the record, the Court must first determine what Nguyen's duties, responsibilities and employment condition were immediately before the time of the various Board actions that allegedly caused the Change in Status he complains of.

### i)  Division of Labor between Janke and Nguyen

Nguyen's position and responsibilities were in flux during the year preceding his resignation.  In August of 2010, at Nguyen's request, the Board hired Janke to take over some of Nguyen's responsibilities.  The Board fired Janke less than a year later, an act which Nguyen claims effected a Change in Status and contributed to his resignation.  The Court will use the context of Janke's hiring and termination to examine what Nguyen's responsibilities were and determine whether the Board's termination of Janke wrought a Change in Status.

The Board approved Janke's employment in late summer of 2010.[13]  Janke was hired as President, Chief Operating Officer, and Vice Chairman of the Board.[14]  Janke explicitly took the position of "President" from Nguyen, but Chief Operating Officer and Vice Chairman were newly created positions.  Janke's responsibilities were described in various ways at various times,[15] but Janke's offer letter is the most complete description of his job functions.  It stated that he was to "execut[e] the day-to-day operations and performance of all functional

---

[13] Ex. 1005, 8/31/2010 Board Minutes.

[14] Ex. 137, Janke offer letter, dated 8/31/2010.

[15] Nguyen told the Board that Janke was to "lead company operations." Ex. 201, 8/30/2010 email from Nguyen to Board.

19

organizations, including Finance, Sales and Marketing, Customer Support and Services, and Engineering" and "interfac[e] with the outside Directors, shareholders, and other institutions, as necessary."[16]

Some of these responsibilities had been Nguyen's before Janke was hired. Specifically, Nguyen had been the President, a position defined in Ezenia's bylaws. The bylaws state that "[t]he President shall be the chief executive officer of the Company, shall have general and active management of the business of the Company, and shall see that all orders and resolutions of the stockholders are carried into effect."[17] The bylaws equating the "President" with "chief executive officer" was the subject of much contention during the trial in this case. Suffice to say, the bylaws intend that the President be the highest executive officer at Ezenia, but when Janke was hired, the Board bifurcated the position. Janke took the responsibility of running the affairs of the company from Nguyen, but Nguyen retained the ultimate executive authority. This division of labor can be seen in Janke's offer letter,[18] Ezenia's various filings with the SEC during Janke's tenure that continue to identify Nguyen as the principal executive, and in Nguyen's title of Chief Executive Officer and Janke's title of Chief Operating Officer. Additionally, various Ezenia employees and directors testified that Nguyen was the principal executive.

Nguyen's authority as the principal executive after Janke was hired was, in fact, mostly titular. This was something intended by both Janke and Nguyen, and understood by the Board.

---

[16] Ex. 137.

[17] Ex. 1003, art. 5 § 7.

[18] "In this position you will report directly to Khoa Nguyen, Ezenia Chairman and Chief Executive Officer." Ex. 137, 2.

After Janke became the President, he in effect assumed control of Ezenia, while Nguyen spent his time trying to generate sales of IWS and maintain existing customer relationships.  No evidence was presented that Nguyen exercised authority over Janke, or that Janke was required to get Nguyen's permission or approval before acting.  In that sense, the offer letter's statement that Janke would "report to" Nguyen was not followed in practice.

Communications between Janke and Nguyen that took place while the two were negotiating Janke's contract and after the Board approved the arrangement demonstrate this.  In an email to Janke dated August 23, 2010, in which Janke and Nguyen were discussing the terms of Janke's employment, Nguyen wrote:

> "I know where I am, mentally speaking, and do not have any inhibition in relinquishing the day-to-day operations and control of the Company to you.  My heart and primary focus are on a different matter. . . .  Besides, to be totally candid, I think you are the better person than me to assume day-to-day operations and control of the Company and effectively run it."[19]

Janke's response to this email highlights that Nguyen's relinquishing control was particularly important: "I accept your word that you truly have no problem relinquishing control of the company to me for it is only under that specific condition that we can possibly derive the best value from my engagement."[20]  Nguyen then replied to Janke, further hammering home the point about Janke leading Ezenia:

> "I believe that you are the better person to lead the Company at this moment and the foreseeable future, especially with regard to getting the Company acquired appropriately and at a good value.  I also understand my state of mind (or

---

[19] Ex. 6, 8/23/2010 email.

[20] Ex. 7, 8/25/2010 email from Janke to Nguyen.

mindless) at the current moment and in the foreseeable future. I further believe that you will prove me right, in this instance."[21]

When Nguyen refers to his "state of mind" and "focus" being "on a different matter," he is referring to his emotional state following his daughter's death. Nguyen's state of mind was one of the primary reasons Janke was hired as the President. This point is obviously missing from Nguyen's letter to the Board introducing Janke and from the Board minutes of the Board meeting where Janke's hiring was approved. The Board, however, understood that Nguyen was not in an emotional position to focus on business affairs and continue leading Ezenia at that time. Snyder and Stevens, both Board members during this time, testified to that effect.

Nguyen testified at trial that Janke had been brought on to help Nguyen run the company—a position consistent with the public statements of Ezenia—and that Nguyen retained the ultimate authority over the executive management team. However, other evidence does not support his testimony. There is no evidence of Janke seeking Nguyen's permission for any acts, or of Nguyen overriding Janke's authority. There is plenty of evidence that Janke was running Ezenia exclusively. For example, after he was hired, Janke presided at every Board meeting, a job that ostensibly should have been Nguyen's; the bylaws direct that the Chairman preside over Board meetings if present.[22] Nguyen was present at every one of these Board meetings, but nonetheless acquiesced to Janke's control of the meetings. Additionally, Janke communicated with the Board members outside of Board meetings and the Board members treated him as the top executive. Board members Stephens and Snyder described Nguyen as largely "absent" from top management level decisions after Janke took control. Indeed, dozens of emails were

---

[21] Id.

[22] Ex. 1003, Art. 5 § 6.

introduced into evidence that show Janke communicating with various Board members in his role as President.  These emails generally relate to company strategy.  Nguyen did not regularly contribute to these emails, despite often being copied on them.

Ezenia employees, including Chief Financial Officer McCann, testified that Nguyen spent his time working and preparing for sales presentations during this time.  Accordingly, the evidence shows that Janke was running the company and Nguyen, while titled CEO and presented as the principal executive,[23] was no longer exercising any control.  He was instead using his ostensible rank and deep knowledge of the company's product to help drive sales.

*ii) Events Leading up to Janke's Termination*

Janke ran Ezenia without direct intervention from the Board from mid-September 2010 through the end of December 2010.  During this time, Janke failed to engage an investment banker or find any potential merger partners for Ezenia.  At trial, there was no evidence presented that Janke even made progress on accomplishing these two goals, both of which Nguyen had cited as the two primary reasons Janke was hired.[24]  Additionally, Janke's management team failed to meet the threshold financial numbers that would avoid Kidston receiving an automatic seat on the Board, so in January 2011 Kidston became a Board member.

Around this time the Board members became more active in their criticism of Janke's management team.  For example, in a December 20, 2010 email to Janke, outside director Stevens criticized Janke's leadership, stating he was perceived to be a "clone" of Nguyen by

---

[23] Nguyen was also held out as the principle executive officer in filings with the Securities and Exchange Commission. The Court finds this to be consistent with the evidence showing that on the surface, Nguyen remained the highest executive of the company.

[24] Ex. 201, 8/30/2010 email from Nguyen to Board.

maintaining the status quo of the company.[25]  Stevens stated that unless "dramatic changes" were made, this perception would continue.  Director Snyder testified that when Janke was hired he was expected to make dramatic changes in a few weeks, but months later no changes had occurred.  During the intervening period, Ezenia's financial position had become much worse and, as a result, the Board was becoming more involved in changing the direction of the company.  One potential change the Board began discussing in December 2010 was reducing the number of officer positions to save cash.[26]  Having Nguyen take an official leave of absence or letting Janke go were both openly discussed.  At the January 2011 Board meeting, the Board discussed potential changes in officer compensation.  Director Stevens was in favor of retaining Janke and having Nguyen take a leave of absence.[27]  Despite this discussion, the Board took no action.

The Board's greater involvement became immediately apparent when Kidston joined its number.  At the first Board meeting he attended, Kidston laid out his vision for salvaging Ezenia.[28]  Kidston's vision of Ezenia's future did not differ much from that which Nguyen had laid out in his last email to the Board in August 2010, but Kidston's timeline was much shorter.  To that end Kidston and the other outside directors began to press management to take specific action to cut costs and step up their efforts to find a transaction partner.

---

[25] Ex. 1058, 2, 12/20/2010 email.

[26] Ex. 1005, 12/8/2010 Board Minutes.

[27] Ex. 1005, 1/11/2011 Board Minutes.  See also Ex. 1058, 12/20/2010 email from Stevens to Janke.

[28] Ex. 1005, 1/25/2011 Board Minutes.

In early March 2011, the Board formed a special committee consisting of Stevens, Kidston, and Janke to work directly with executive management to reduce spending. Nguyen, while present for this meeting, did not object to the committee's formation.[29]  At this same meeting, the Board formally resolved that all Board members and the executive management team would focus all their time on finding a potential transaction partner for Ezenia. Nguyen did not object to this resolution.[30]  Soon after this meeting, as part of the spending reduction effort, a large percentage of Ezenia's staff was laid off.  After this first round of layoffs, the spending committee continued to look for ways to reduce spending.  During an email exchange initiated by Kidston, in which he suggested various ways for Ezenia to conserve cash, Janke recommended terminating his own employment.[31]  Nguyen was a recipient of this email but made no objection or comment in reply to the other Board members as a group.  Janke made clear in this email that his termination had been discussed before.[32]

In making the recommendation that his employment be terminated, Janke stated that the suggestion was an alternative to "contest[ing] with the Board for operating control of the company."  This statement lends support to the Debtor's position that it was Janke and not Nguyen who was controlling the operations of Ezenia.  If Nguyen had been in control, Janke would not have had cause to make this statement.

*iii) Janke's Termination and Nguyen's related Change in Status Claims*

---

[29] Ex. 1005, 3/4/2011 Board Minutes.

[30] See id.

[31] Ex. 1104, 3/14/2011 email from Janke to Board.

[32] "As we have discussed before, rather than contest with the Board for operating control of the company, I would suggest terminating my employment."  Id. (emphasis added).

A few weeks later, the Board met on April 1, 2011 for the express purpose of terminating Janke's employment.[33]  Several days before, on March 30, 2011, directors Kidston and Snyder called Janke to tell him that they had the votes to terminate his employment at the next Board meeting, Friday, April 1, 2011.  Janke promptly informed Nguyen and the other officers of this turn of events.

Part of Nguyen's claim is that Snyder and Kidston terminated Janke's employment on March 30, 2011, without consulting Nguyen.  It is clear that Janke was not terminated on March 30, 2011.  There is no evidence that Kidston and Snyder had received prior Board authorization, in accordance with Ezenia's bylaws, to act to terminate Janke before the April 1 Board meeting. Nothing in Ezenia's bylaws would authorize two individual Board members to terminate an officer without a prior Board vote.  Nguyen has not pointed to any other legal principle that would otherwise give them such authority.

The other part of Ngyuen's claim as it relates to Janke's termination is that the Board terminated Janke over Nguyen's objection and without consulting him, resulting in a Change in Status.  Given Nguyen's duties and responsibilities at the time of Janke's firing, the Board's termination of Janke over Nguyen's objection was not a change in his status.  The Board had the authority to appoint the officers it wanted under Article 5 of the Bylaws.[34]   Article 5, section 2 provides that "[t]he Board of Directors . . . shall choose a President . . . and such other officers, if any, as the Board of Directors in its discretion may determine."  This language empowers the Board and not an officer—like Nguyen—to choose the President of the company.  Accordingly,

---

[33] Ex. 1005, 4/1/2011 Board Minutes.

[34] Ex. 1003, Amended and Restate By-Laws of Ezenia, Inc.

the Board was also within its authority when it decided that Janke was no longer the President it wanted.

There is nothing in the bylaws or in the Employment Agreement that would give Nguyen veto power over the Board's decision in this regard.[35]  Nguyen's argument on this point boils down to the fact that the Board had never before fired his subordinate officers over his objection, so Janke's firing must have been a diminuition in his employment condition under the Employment Agreement.  However, Janke was not de facto or de jure a subordinate officer, as described above.[36]  Janke was the fully functioning President of Ezenia.  There is no evidence that he actually reported to Nguyen or had to run decisions by Nguyen.[37]  Nguyen's duties and responsibilities had changed before the time Janke was fired; Nguyen was focusing on leading the sales team and not on strategic operational decisions.  Accordingly, Janke's termination over Nguyen's objection did not, by itself, effect an adverse change in Nguyen's status.

Nguyen also contends that the Board diminished his employment condition by terminating Janke without consulting him before the April 1 Board meeting.  The Court finds this position without merit.  The Board had been discussing possibly eliminating one or more

---

[35] Nguyen himself noted this in an email to Janke, dated March 10, 2011: "The board always has the right to remove any of us at anytime they choose to do so, at their discretion." Ex. 1084.

[36] Section III(A)(i) of this opinion.

[37] The Court is aware that Janke's employment offer letter stated that Janke would "report to" Nguyen.  The weight of the evidence is not consistent with the offer letter.  Essentially, the only evidence Nguyen presented to demonstrate that he was exercising plenary authority over Ezenia after Janke's hiring consisted of an organizational chart drafted by Vice President of Customer Relations, Keith Baron, and various filings with the SEC.  While these items would tend to support Nguyen's theory, the other evidence overwhelmingly goes the other way.  There are no emails, communications, and no credible, material testimony concerning specific instances where Nguyen directed or exerted control over Janke.

officer positions months before Janke's termination.  Nguyen was at the Board meetings when Stevens raised this issue.  Additionally, Nguyen was a recipient of the email Janke sent, in which Janke recommended his own termination and referenced previous discussions.[38]  While Nguyen apparently chose not to engage in the discussions that were taking place during those months leading up to the April 1 Board meeting, he had an opportunity to do so.  Finally, there is email and direct testimonial evidence that Kidston attempted to contact Nguyen on March 30, the same day Kidston and Snyder informed Janke of their intention to vote to terminate his employment, but Kidston and Nguyen were not able to speak until the morning of April 1, before the Board meeting.

During the last three days of the twenty day trial in this case, and at the closing arguments, Nguyen reversed course and attempted to claim that Janke's firing was a change adverse to him because it forced him to take up all of Janke's duties personally, burdening Nguyen's valuable time.  For most of the trial up to that point, Nguyen had been arguing that Janke's firing diminished his authority to hire and fire his subordinate officers.  The Court finds this last-ditch argument unconvincing for a number of reasons.

Nguyen has argued consistently since the onset of the trial that he was the highest officer of Ezenia both in title and practice during all of Janke's tenure as President, with ultimate responsibility for the company's management.  From this position, it would follow that Nguyen actually was responsible for all of Janke's duties and tasks and that Nguyen had simply delegated some of them.  From this position, it also follows that when the Board fired Janke, it

---

[38] The April 1, 2011, Board Minutes show that Nguyen claimed not to have seen this email.

would not have increased Nguyen's responsibilities, since he was already ultimately responsible for everything Janke was doing.

Nguyen's position, articulated in the previous paragraph, is inconsistent with his last-ditch argument, claiming that Janke's firing was an adverse change in his job responsibilities and duties[39] because it foisted new and unwanted responsibilities upon him. According to Nguyen's position for most of the trial, he would already have born Janke's responsibilities, if at a more abstract level. The weight of the evidence shows that Nguyen's resignation, insofar as it had anything to do with Janke's firing, was caused not by an unwanted increase in job duties, but by what Nguyen saw as the Board's overstepping its authority in firing Janke over his objection and without the proper amount of discussion.

As the Court articulated above, Nguyen must show that his resignation was caused by the Change in Status event. The weight of the evidence does not support a finding that Nguyen resigned on account of the Board forcing him to do Janke's job. The evidence shows precisely the opposite, that Nguyen continued to do exactly what he had been doing since Janke was hired: working with the sales team to generate new contracts for Ezenia. For example, after Janke was fired, CFO McCann emailed an employee of Ezenia and told them to change the website to reflect that the position of "President" was open.[40] Additionally, there is no evidence of Nguyen communicating regularly with Board members as Janke did, or of Nguyen trying to find a transaction partner for Ezenia. Nguyen continued to focus his efforts on sales—what he had been doing since September 2010. At the next Board meeting after Janke's termination on April

---

[39] As those terms are defined in § 5.1 of the Employment Agreement.

[40] Ex. 1207, 4/6/2011 email from Tom McCann to Pia Bertone-Gross and Keith Baron.

18, 2011, Nguyen's substantive contribution was to update the Board on two new business opportunities. This sales update was in keeping with other updates he had provided the Board since Janke's hire. There was no evidence of Nguyen providing the Board with updates or reports on any other matters.

*iv) Nguyen's Change in Status Claims related to M&A Activity*

Nguyen also claims that the Board's involvement in various aspects of Ezenia's seeking a merger or acquisition candidate resulted in a Change in Status. These claims mainly revolve around Ezenia's dealings with ArX Moble. Generally, Nguyen's claims in this area fall into three categories: (1) the Board picked ArX and other candidates without consulting him, (2) the Board ratified contracts signed by individual Board members rather than directing Nguyen to sign the contracts, and (3) Board members contacted employees directly when they should have contacted Nguyen.

Ezenia began the process of seeking a merger or acquisition candidate almost a year before Nguyen resigned. One of the main reasons Janke was hired as President was to help find Ezenia a transaction partner. By March of 2011, Ezenia's situation had become desperate, and the executive management team under Janke had not even opened discussions with another entity. At the March 4, 2011 Board meeting, in apparent recognition of Ezenia's desperate straights, Janke—presiding over the Board meeting—directed the entire Board to do all it could to seek a potential transaction partner. Nguyen was present at this meeting, but is not recorded as making any comment on this matter.

After Janke's directive, on March 14, Snyder sent an email to Janke, directors Kidston and Stevens, and CFO McCann stating that the three outside directors had opened up discussions

with ArX Mobile and its CEO Phil Sweatman.[41]  In this email, Snyder asked Janke to sign a

Non-Disclosure Agreement (NDA) so that Ezenia and ArX could exchange confidential

information without worry of its unauthorized dissemination.  Janke executed and returned the

NDA the next day.  A few days later, Kidston emailed Janke, asking him to meet with ArX's

CEO.  ArX's CEO, however, refused to meet with Janke unless a signed, non-binding LOI

regarding a deal was in place.  Janke likewise refused to sign an LOI until he felt it was

"expressive of [Ezenia's] intent" on a deal.[42]  Several days after Janke refused to sign the LOI, he

met with ArX's CEO, despite the absence of a signed LOI.  Janke summarized his view of ArX

in an email to the entire Board, including Nguyen:  "[a]lthough it is still not clear to me what

synergies there may be, we plan to have our chief technology people meet next week here to get

into the details and see what emerges."[43]

   After Janke and ArX's CEO met, directors Kidston, Stevens, and Snyder apparently lost

patience with Janke and decided it was alright if one of them signed the LOI, given its non-

---

   [41] Ex. 1090, 3/14/2011 email.  At trial, Nguyen made much ado about having been left off this email, taking it as a personal slight and offering the omission as evidence of the Board's exclusion of him in the decision-making process about ArX.  The Court notes, however, that Nguyen was a recipient of many of the emails concerning ArX—other than this email.  It does not appear that he was systematically left out of email communications.  For example, Janke forwarded Nguyen this email less than a day after Janke himself received it, albeit in a "BCC." Ex. 1090, 3/15/2011 email.  Snyder testified that he did not bother to email Nguyen at times because Nguyen never responded to him.  Rather, he would email McCann who would then update Nguyen.  The record supports Snyder's assertion.  There are less than a handful of instances in which Nguyen emailed directors other than Janke, but many emails where McCann forwarded the various directors' emails to Nguyen.

   [42] Ex. 1095, 2, 3/21/2011 email from Janke to Sweatman, Kidston, and Nguyen.

   [43] Ex. 1098, 3/23/2011 email.

binding nature.  Kidston signed the document on March 30.[44]  At the April 1, 2011 Board

meeting, the Board voted to ratify Kidston's signature.  Nguyen was present at this meeting and

voted against the ratification.  Soon after, ArX's CEO began to meet with various Ezenia

employees to receive demonstrations of Ezenia's products.  The record is unclear how these

meetings were organized.  On April 4, 2011, Nguyen sent an email to his personal lawyer and to

Janke claiming that "Sweatman [ArX's CEO] wanted Bob [an Ezenia consultant] to send

proprietary information over to him without any NDA being signed."[45]  Nguyen then claimed

that Kidston had directed Bob not to send the information, after Bob asked Kidston.  Nguyen

complained that all these actions were a "direct diminution" of his "responsibility and authority."

This situation continued for another two weeks, with ArX's CEO trying to get

information from various people at Ezenia and different Board members at various times telling

Ezenia employees different things.  None of this was mentioned at the April 18, 2011 Board

meeting, despite Nguyen's presence.  Things came to a head on April 19, 2011, when an Ezenia

consultant told Snyder that he would not supply certain information to ArX's CEO without a

formal Board directive, where different Board members and Nguyen were telling him different

things.  The Board met on April 22, 2011 to resolve this issue.  In the minutes, Nguyen is

recorded as claiming that he did not know anything about ArX.[46]  After providing the

background, Snyder stated he would introduce Nguyen to the ArX CEO.

---

[44] Ex. 1091, 3/17/2011 email exchange; Ex. 1099, 3/30/2011 email from Kidston to
Stevens and Snyder.

[45] Ex. 1123, 4/4/2011 email from Nguyen to Janke and West.

[46] "Mr. Nguyen being appraised for the first time with the ArX engagement, requested the
background information regarding Mr. Sweatman and the potential transaction."  Ex. 1005,
4/22/2011 Board Minutes.

Given these facts, the Board did not exclude Nguyen from the dealings with ArX. Nguyen was on notice as early as March 15, 2011 of the potential ArX transaction when he received emails regarding the signed NDA.  No evidence was presented of Nguyen asking the directors for information about ArX or offering any opinions about ArX to the outside directors before the April 22, 2015 Board meeting.  At trial, Nguyen stated his opinion was that the directors should have come to him and provided all the information; the burden was not on him to involve himself.  Even if the Court were to accept Nguyen's position as company policy, the ArX issue was raised officially at the April 1, 2011 Board meeting.  Nguyen even voted against ratifying the non-binding LOI that Kidston signed.  After the issue was officially raised, Nguyen could not willfully choose not to participate and use his lack of participation as part of a claim that the outside directors excluded him from the discussions.  The evidence shows that Nguyen excluded himself.

Another facet of this situation involves Nguyen's changed role at Ezenia by April 2011. As the Court discussed previously, Nguyen ceded control of the company to Janke in September 2010, while retaining his title as CEO and full salary.  The Board approved this change.  After Janke was hired, Nguyen focused on generating new sales.  Because Nguyen had removed himself—voluntarily—from daily operational and strategic discussions, it is not surprising that he was not immediately involved in the discussions about ArX.  The changing of Nguyen's duties, responsibilities and employment condition occurred when Janke was hired—not when the outside directors began to take initiative (at the express direction of then-President Janke) and seek transaction partners for Ezenia.

After Janke was fired, Nguyen did not involve himself in Ezenia's daily operations or strategic decisions to a greater extent.  This can be seen in the confusion that took place when ArX's CEO attempted to work with Ezenia to conduct due diligence between April 1 and April 22, 2011.  Janke had been in direct contact with ArX's CEO.  After he was fired, Nguyen did not assume that duty until the Board directed him to do so at the April 22 Board meeting.  This lack of leadership resulted in confusion about what documents and materials were to be provided to ArX.

Even though Nguyen was aware of the ArX due diligence, he intentionally avoided personal involvement.  For example, in emails to Janke and other Ezenia personnel, sent after April 1, Nguyen criticized the ArX CEO's conduct in performing the due diligence, but there is no evidence that he ever contacted him directly until after April 22, 2011.  Given that Ezenia had a five-person Board and just 13 remaining employees, the Court cannot help but see this failure as intentional on Nguyen's part.

Nguyen also claims that the Board's ratification of the non-binding LOI with ArX at the April 1 Board meeting resulted in a Change in Status.  Kidston signed the LOI on March 30 in his individual capacity as a director of Ezenia.  The Ezenia bylaws do not empower individual directors to take any action on behalf of the corporation.  Accordingly, Kidston's signature had no legal effect until it was ratified.  Article 5, section 3 of Ezenia's bylaws provides that the Board can appoint whatever agent it wants, aside from the company's other officers.  In ratifying Kidston's signature, the Board simply authorized, after-the-fact, Kidston to act as its agent to sign the LOI with ArX.  This appears to be an action authorized under the Bylaws.

At the time of the April 1 meeting, when the LOI was ratified, Nguyen's responsibilities do not appear to have included signing corporate documents relating to potential mergers. Again, after Janke's hire there is no evidence that Nguyen signed any such documents.  It was Janke that signed the ArX NDA and Janke that would not sign the LOI.  If anyone's status was changed by the Board's action, it was Janke's, not Nguyen's.  Nguyen has offered evidence that he signed LOIs before Janke was hired, but this fact does not change the analysis.  It was Janke's hiring that altered Nguyen's duties and responsibilities, not the Board's actions in March and April of 2011.

Finally, Nguyen argues that the directors' contact with Ezenia employees, without passing through Nguyen, violated the "chain of command" and diminished his authority, resulting in a Change in Status.  The same arguments apply here as with the other ArX-related claims.  Nguyen had focused on generating sales since Janke was hired.  After Janke was fired, Nguyen did not step into Janke's role.  The evidence demonstrates this; Nguyen did not contact ArX's CEO after Janke was fired to pick up off where Janke left off.  Rather, he did nothing, even when ArX's CEO was at Ezenia's facility.  Nguyen only involved himself when employees asked him direct questions about whether source code should be provided to ArX and even then his involvement was limited to directing that it not be provided.  Nguyen's intentional lack of involvement was apparent when he claimed that there was no NDA in place between ArX and Ezenia, despite the fact that he was on the emails where Janke stated that he signed one.  Nguyen intentionally stayed out of the ArX matters.  Intentional action on Nguyen's part cannot result in a Change in Status by the Debtor under the Employment Agreement.

*v) Nguyen's Remaining Change in Status Claims*

The Court considers the balance of the Change in Status claims to be less factually complex, and so will address them together.  The first of these claims relates to certain "Performance Requirements" for Nguyen the Board approved by a 3-2 vote at the April 22, 2011 Board meeting.  The Performance Requirements are contained in a memorandum addressed to Nguyen, dated April 22, 2011.[47]  In the Performance Requirements memorandum, the Board directs Nguyen, in his capacity as CEO, to develop a budget in 30 days, come up with a plan for the MxM software, find an investment banker and tax expert, work with potential merger partners, and review contracts to identify cost savings.  This consists of the list of tasks that Janke was performing—without substantive progress—before his departure.  This list is also generally consistent with the list of tasks that Nguyen outlined in his letter to the Board in August 2010 after Janke was hired.  Additionally, one or more of the items in the Performance Requirements had been discussed at every Board meeting since December 2010.

Nguyen alleges that the Performance Requirements were a diminution and adverse change to his job duties and responsibilities.  At the April 1, 2011 Board Meeting, Janke claimed the same thing when he argued against the imposition of a "materiality document" similarly designed to convey Board directives to management.[48]  The first paragraph of the Performance Standards memo states, "[t]hese goals are consistent with the standard duties of the board relative to management and are consistent with your employment as CEO."  The Court credits

---

[47] Ex. 1137.  The title of the memo in this exhibit is "Performance Standards" the Board amended the title to call it "Performance Requirements" at the April 22 Board meeting.  See Ex. 1005, April 22, 2011 minutes.

[48] The Court gives little or no weight to Janke's statements at this meeting.  At this time Janke was assisting Nguyen and Nguyen's personal lawyer in building a case against Ezenia to help Nguyen be able to resign with his severance.  Accordingly, the Court finds that Janke's motivation and independence were questionable at this time.

the Board's view and discredits Nguyen's view.  None of the directives contained in the Performance Requirements can be construed as a change "adverse" to Nguyen or a "diminution" as those terms are commonly used.  Nguyen, despite having voluntarily reduced his duties with the hiring of Janke, still remained CEO and was paid the same salary as he had been paid before Janke was hired as President.  As CEO he could have been called on to perform the duties that went along with that title at any time. The Board had been content to let Nguyen focus on sales while Janke was President.  The Board's decision to fire Janke and formally require Nguyen to do more than focus on sales cannot be construed as adverse to Nguyen.  The Board was simply requiring him to perform all the responsibilities that he could be called to perform under his contract.  In making this determination, the Court places substantial weight on the fact that the Performance Requirements are so similar to the letter Nguyen himself sent to the Board in August 2010.  The similarity shows that they cannot be considered adverse; it shows that Nguyen considered these items to be the proper course of action and the province of the CEO to implement.

Nguyen also claims that Stevens signing of a consulting agreement with Tempest Systems was a diminution of his status.  Stevens signed the agreement after the April 22 Board meeting.  At this meeting, the Board contemplated the agreement and authorized Stevens to negotiate it.  The Court finds this did not result in a Change in Status for the same reasons it finds that the Board's ratification of the LOI Kidston signed with ArX did not result in a Change in Status. See supra at § III(A)(iv).

Finally, Nguyen claims that North & Webster's visit to Ezenia resulted in a Change in Status.  The Board, after a formal vote, resolved to send representatives from North & Webster

to find out more information about what was going on inside Ezenia.  The Board passed this resolution at the April 1, 2011 meeting.  The Board had the authority under the Ezenia bylaws to appoint whatever agents it wanted to.[49]  Nguyen argues that North & Webster showed up without notice and interfered with daily operations of Ezenia employees.  In truth, Nguyen was not even present at Ezenia during the visit.  In an email to his lawyer and Janke, Nguyen complains that the visit took place while he was at a doctors appointment, resulting in a diminution of his authority.[50]

The Court finds this is another instance of Nguyen willfully choosing not to be part of the process. The Board had the authority to send in an agent to get a third party perspective on Ezenia's operations.  If Nguyen wanted to control this process, he could have contacted North & Webster.  There is no evidence that he did so.  In fact, the evidence shows that Nguyen did not even remember that the Board authorized North & Webster's visit.  What Nguyen could not do was intentionally remove himself from Ezenia's headquarters and then complain that he was not involved.  For the preceding six months, Nguyen had not been involved with the details of daily operations and by April 2011, he had not resumed those responsibilities at Ezenia.

*vi) Nguyen's Status Claims arising after April 28, 2011*

The Court will not consider Nguyen's Change in Status claims based on events that took place after April 28, 2011.  After that date, the evidence shows that Nguyen evinced a firm intent to resign and stopped performing many of the essential functions required under the Employment Agreement.  On April 21, 2011, Nguyen sent an email to his lawyer and Janke stating that

---

[49] Ex. 1003, art. 5, section 3.

[50] Ex. 1123, 2-3, 4/4/2011 email from Nguyen to Janke and West.

"following the delivery [of the] letter, I will stop going to the office and stay home."[51]  The subject line of this email was "Khoa Resignation Letter (2).doc."  The Court infers that Nguyen intended to stay home following the delivery of his resignation letter.  The draft letter was delivered on April 28, 2011, with the heading "For Settlement Purposes Only."[52]  After the draft resignation was delivered, Nguyen attended no more Board meetings.

The morning of April 28, Nguyen sent an email to Vice President Baron, stating "there is a slight delay of my resignation until May 04th."[53]  On May 2, Kidston sent an email to Stevens and Snyder stating, "I understand that Khoa is planning to resign this week."[54]   On May 4, Nguyen sent an email to a friend stating, "[i]n cleaning out my e-mail today, in anticipation of my departure from Ezenia in the very near future . . . ."[55] In all of these emails, Nguyen's impending resignation is not in doubt.

At trial, Nguyen testified that he had not definitively decided to resign until June 8, the day he did in fact submit his formal resignation.  The evidence does not confirm this testimony. In every email in the record on the subject, Nguyen is firm in his intention to resign, starting on April 21.  In the same April 21 email to his lawyer and Janke, Nguyen stated that his "authority and responsibility" had been "irreversibly damag[ed]."[56]

---

[51] Ex. 1135, 2, 4/21/2011 email.

[52] Ex. 1147, 4/28/2011 email from Nguyen's attorney to Ezenia's attorney.

[53] Ex. 1148, 4/28/2011 email.

[54] Ex. 1149, 5/2/2011 email.

[55] Ex. 1154, 5/4/2011 email.

[56] Ex. 1135, 5/21/2011 email.

Nguyen further testified that he continued to come into the office and do his job all the way until he officially resigned on June 8.  Again, the Court does not credit this testimony because the other evidence does not support it.  After April 28, there is little evidence that Nguyen did anything other than make a few trips, apparently in furtherance of various new sales opportunities.  There is no evidence that he made progress on the items listed in the Performance Requirements and no evidence that he was fulfilling the duties of CEO.  There is a considerable amount of evidence that he spent most of his time working on the settlement agreement with the Board.  Snyder arrived at Ezenia in mid-May and found Nguyen's office completely cleaned out.  Again, this is consistent with Nguyen's intention to leave Ezenia.

Under Massachusetts law, "a material breach of contract by one party excuses the other party from performance as [a] matter of law."  Hastings Assoc., Inc. v. Local 369 Bldg. Fund, Inc., 42 Mass. App. Ct. 162, 171 (1997) (citing G.M. Abodeely Ins. Agency, Inc. v. Commerce Ins. Co., 41 Mass. App. Ct. 274, 278 (1996)).  A material breach occurs when there is a "breach of an essential and inducing feature of the contract."  Prozinski, 59 Mass. App. Ct. at 608-09 (citing Restatement (Second) of Contracts § 237 (1981)).  The determination of whether a material breach has occurred is a question of fact.  See id. at 609.

Here, the Court finds that after April 28, 2011, Nguyen was in material breach of the Employment Agreement for failing to attend further Board meetings, for deciding to no longer go into the office, for failing to make any appreciable progress on the items in the performance requirements, and for failing to provide leadership to Ezenia.  Each of these failings contribute to Nguyen's breach of an essential and inducing feature of the Employment Agreement.  There is simply no credible evidence in the record that Nguyen was doing much at all except for sporadic

sales-related activity after April 28, 2011.  This activity was patently insufficient for Nguyen to

satisfy his obligations to Ezenia under the Employment Agreement, especially in light of the dire

financial straights the Debtor was in at the time.  Since Nguyen was in material breach, the

Board was not required to refrain from doing things that may otherwise have triggered the

Change in Status clause.

For all of the foregoing reasons, the Court finds that Nguyen did not resign on account of

a Change in Status and accordingly that he is not entitled to receive severance.  The Court shall

disallow the entirety of Nguyen's claim based on his right to severance under the Employment

Agreement.  Because the Court has determined that Nguyen is not entitled to receive severance,

Mrs. Nguyen's claim must also be disallowed in its entirety as her claim is wholly premised

upon Nguyen's right to receive severance.  See § II(B)(1) of this opinion.

B.     Deferred Compensation

Nguyen's claim for $270,000 in deferred compensation is not affected by the Court's

decision regarding his claim for severance payments.  Rather, the deferred compensation claim is

based on two separate documents, the Debtor's deferred compensation plan[57] (the "Plan") and

the trust agreement created under that plan[58] (the "Trust").  Under the Plan, an employee could

elect to defer receipt of certain types of compensation until a later date.  These types of

arrangements are commonly known as "top hat" plans and allow certain employees to put off tax

---

[57] Ex. 551, "The Ezenia! Inc. Deferred Compensation Plan, effective Jan. 1, 2009."
Ezenia cited to a prior version of the Plan, which became effective in 2006.  See Ex. 1006.
Nguyen stated at trial that the Plan effective in 2009 was the binding document.  The Court
reviewed both versions of the Plan and did not find any differences material to the legal question
it must address in this opinion.  For the sake of clarity, when the Court refers to the Plan, it refers
to the Plan that became effective in 2009.

[58] Ex. 1006, "Trust Agreement Under The Ezenia! Inc. Deferred Compensation Plan."

liability on deferred wages for tax-planning purposes.  See Synovus Trust Co., N.A. v. Bill Heard Enter., Inc. (In re Bill Heard Enter., Inc.), 419 B.R. 858, 863 (Bankr. N.D. Ala. 2009) ("The main purpose of the plan is to defer the payment of taxes. . . .  The idea is to defer the receipt of compensation until retirement or termination of employment, when the employee is in a lower tax bracket, thus reducing the overall amount of taxes paid.") (quoting IT Group Inc., 448 F.3d 661, 664-65 (3d Cir. 2006)).  Top hat plans are subject to some of the requirements of ERISA but not afforded many of the substantive protections common to other employee benefit plans.  Id.  In order to avoid being subject to the other provisions of ERISA and to achieve the tax-deferral benefits, top hat plans force participating employees to shoulder a certain risk of non-payment; compensation deferred is considered a corporate asset and the employee only has an unsecured claim against the employer for that asset in the event of the company's insolvency. Despite this arrangement, an employee's right to compensation so deferred is considered fully "vested" at the time it is earned but not realized until receipt for tax purposes.[59]  See In re Merry-Go-Round Enter., Inc., No. 94-50161-SD, 1999 WL 33457180 at *4 (Bankr. D. Md. Oct. 21, 1999) ("Each Executive was vested in his deferred compensation pre[-]petition.  Once vested, the Executive owed no further performance to [the debtor] in order to receive the deferred compensation payments that had been earned pre[-]petition.").

In order to give participating employees a modicum of greater security in their deferred compensation, employers often use a rabbi trust arrangement.  The rabbi trust is an irrevocable trust that lets an employer set aside funds for the benefit of an employee participating in a top hat plan.  However, in order to be a rabbi trust, the trust must provide that the trust res remain the

---

[59] See Plan, § 3.3, entitled "Vesting."

property of the employer and be subject to the claims of creditors of the employer in the event

the employer becomes insolvent—in other words, the employee has no right to the trust res until

disbursement in accordance with the terms of the employer's deferred compensation plan.

Synovus Trust Co., 419 B.R. at 864-65; see also Silicon Graphics Inc. v. Merrill Lynch Trust Co.

of California  (In re Silicon Graphics, Inc.), 363 B.R. 690, 696 (Bankr. S.D.N.Y. 2007) ("To

qualify for these tax benefits, however, participants do not have rights that attach to any specific

funds.").

 The Plan and the Trust are both consistent with the typical top hat plan and rabbi trust

terms.  Paragraph 3.5 of the Plan provides:

> No person shall have any right, other than the right of an unsecured general
> creditor, against the Employer with respect to the benefits payable hereunder, or
> which may be payable hereunder, to any Participant or Beneficiary.
> Notwithstanding the foregoing, in order to pay benefits under the Plan, the
> Employer may establish an irrevocable non-qualified grantor trust. . . .  The assets
> in such Trust shall at all times be subject to the claims of the general creditors of
> the Employer in the event of the Employer's bankruptcy or insolvency, and
> neither the Plan nor any Participant or Beneficiary shall have any preferred claim
> or right to, or any beneficial ownership interest in, any such assets of the Trust
> prior to the time such assets are paid to a Participant or Beneficiary, and all rights
> created under the Plan and said Trust shall be unsecured contractual rights of a
> Participant or Beneficiary against the Employer.

The Trust is consistent with the terms of the Plan.  Section 1(d) of the Trust provides:

> Plan participants and their beneficiaries shall have no preferred claim on, or any
> beneficial ownership interest in, any assets of the Trust.  Any rights created under
> the Plan and this Trust Agreement shall be mere unsecured contractual rights of
> Plan participants and their beneficiaries against the Company.  Any assets held by
> the Trust will be subject to the claim of the Company's general creditors under
> federal and state law in the event of Insolvency, as defined in Section 3(a) herein.

Nguyen opted to participate in the Plan in 2006 and deferred $180,000 of his 2006 base pay.[60]  Both the Plan and the Trust contemplated that this money could be invested in some manner.[61]  Nguyen did in fact direct the investment of his deferred compensation and it remained invested, in the Trust, until after the filing of the Debtor's bankruptcy.

Nguyen elected to receive his deferred compensation in lump sum on "January 1st of the year following [his] Termination of Employment or Change in Status."[62]  Here, it is undisputed that Nguyen's employment at Ezenia ended in 2011.  Accordingly, under the Plan he would have received his deferred compensation on January 1, 2012, but for the filing of the Debtor's chapter 11 petition.

The terms of the Trust specified what was to happen with the Trust assets when Ezenia became insolvent—ignoring, for the moment, any other limitations or powers federal law imposed on or granted to the Debtor post-petition.  Generally, § 3 of Trust deals with what would happen if Ezenia became insolvent.  Section 3(a) provides that "the Company shall be considered 'Insolvent' for the purposes of this Trust Agreement if . . . (ii) the Company is subject to a pending proceeding as a debtor under the United States Bankruptcy Code."  Section 3(b)(3) provides that in the event of bankruptcy the trustee of the Trust "shall discontinue payments to

---

[60] See Ex. 1006, "Exhibit B, Election of Deferral Agreement".

[61] See generally, Plan, § 3.4 "Earnings" ("The Employer shall credit deemed gains, losses and earnings to a Participant's Deferral Account at the end of each fiscal quarter. . . .  The Employer shall specify procedures to allow Participants to make elections as to the deemed investment of amounts newly credited to their Deferral Account. . . ."); Trust, § 5 (entitled "Investment Authority"); § 6 ("During the term of this Trust, all income received by the Trust, net of expenses and taxes, shall be accumulated and reinvested."); § 7 ("The Trustee shall keep accurate and detailed records of all investments. . . .").

[62] Ex. 1006, "Exhibit B."

44

the Plan participants or their beneficiaries and shall hold the assets of the Trust for the benefit of the Company's general creditors."  Section 3(b)(4) provides that payments to beneficiaries would only resume once Ezenia became "no longer Insolvent."

Ezenia filed its chapter 11 petition on September 30, 2011.  The very next day, Ezenia's CEO, Larry Snyder, directed the trustee of the Trust to turn over all of the Trust res to the bankruptcy estate, and the trustee complied.  As of October 1, 2011, the value of the Trust assets was $170,155.24; according to the Debtor after expenses associated with the withdrawal, the company received $168,891.80.[63]  Nguyen personally tracked what the value of the Trust assets would have been, through September 2014, had the Debtor not liquidated the Trust assets. Nguyen's testimony was that the value of the Trust assets would have been $270,000, as of August 29, 2014, and he is accordingly claiming this amount in his proof of claim.

The Debtor's objection to this portion of Nguyen's claim is simple.  It argues that Nguyen's deferred compensation claim should be limited to the $168,891.80 that the company received from the Trust; any hypothetical investment gains that would have accrued to Nguyen's Trust account are too speculative to be considered.

Nguyen counters that the Debtor had no authority to revoke the Trust, pointing out that the Trust is an "irrevocable" trust and citing § 4 of the Trust, which provides:

> Except as provided in Section 3 hereof, the Company shall have no right or power to direct the Trustee to return to the Company or to divert to others any of the Trust assets before all payment of benefits have been made to Plan participants and their beneficiaries pursuant to the terms of the Plan.

---

[63] Ex. 1008, Ameriprise Achiever Circle Portfolio Review, Beginning Value, period 10/1/2011 - 12/31/2011.

Nguyen argues that since the Debtor had not finished paying his benefits, it should not have

diverted the Trust assets. Nguyen is not arguing that he had a specific right to the assets in the

Trust—both the Plan and the Trust make clear that he, as a Plan participant and Trust

beneficiary, has no right to the specific assets, which remain corporate assets—rather he is

arguing that the fluctuating value of the Trust assets would have been the only correct measure

of the value of his deferred compensation claim. By liquidating the Trust, Nguyen claims the

Debtor prematurely destroyed that index and argues that the Debtor should not benefit from that

inappropriate destruction.

Both the arguments of the Debtor and Nguyen miss the mark. The Trust and Plan

provide that in the event of bankruptcy, the claim of a Plan participant for deferred compensation

is an unsecured claim against Ezenia, not a claim to specific Trust assets. 11 U.S.C. § 502(b)

provides that if a party objects to a claim, a court "shall determine the amount of such claim in

lawful currency of the United States <u>as of the date of the filing of the petition</u>, and shall allow

such claim in such amount" (emphasis added). Here, Nguyen's claim for deferred compensation

was unmatured as of the petition date; it was not payable until January 1, 2012. The definition of

"claim" in § 101(5)(A) specifically contemplates that "unmatured" claims are still claims and

thus potentially allowable under § 502.

Courts examining unmatured, deferred compensation claims, such as Nguyen's, have

held that the filing of the petition has the effect of accelerating the claim for allowance purposes.

In <u>In re Trace Int'l Holdings, Inc.</u>, the bankruptcy court examined the procedure for allowing the

unmatured, deferred compensation claim of the debtor's former CFO. There, the CFO had

entered into a deferred compensation agreement with the debtor to receive a total of $500,000, in

46

120 installment payments, after he reached the age of 65.  See Pereira v. Nelson (In re Trace Int'l. Holdings, Inc.), 284 B.R. 32, 35 (Bankr. S.D.N.Y. 2002).  As of the petition date, the CFO was approximately 8 years from beginning to receive any benefits under the deferred compensation plan.  Id.  The Court held that the language of § 502(b) directing courts to determine amounts of claims "as of the date of the filing of the petition" had the effect of "accelerating" the unmatured claim.  To offset the windfall such acceleration would otherwise afford the creditor, the court held that the $500,000 claim would have to be discounted to its present value.  Id. at 39; see also Merry-Go-Round Enter., Inc., 1999 WL 33457180 at *7 (allowing unmatured, deferred compensation claims in the amount of their present value as of the petition date).

Here, the Debtor has objected to Nguyen's claim and the Court must allow the claim as it was valued on the petition date.  As previously noted, Nguyen's claim was unmatured on the petition date, but only about three months away from becoming payable.  Nguyen's claim is slightly different from the creditor's claim in In re Trace.  There, the claim was for a defined amount—$500,000.  Here, the value of Nguyen's claim is dependent on the value of the assets of the Trust.  Pre-petition the value of that claim would fluctuate based on the performance of the Trust's investments.  Nguyen has argued that the Court should look at the post-petition value of his claim, what the value of the Trust would have been had the Debtor not liquidated it.  This argument ignores the text of § 502(b) and the type of claim Nguyen is entitled to.

The parties agree that Nguyen's deferred compensation claim is a general unsecured claim.  Its amount is fixed as of the petition date.  11 U.S.C. § 502(b).  This is not an administrative claim that can increase post-petition.  Even if the Debtor had not liquidated the

Trust, the Court would still have to value Nguyen's claim as of the petition date, without regard to the Trust's post-petition increase or decrease in value. For these reasons, the Court declines to accept Nguyen's argument about post-petition investment appreciation.[64]

Nguyen's interest in his deferred compensation vested upon his resignation prepetition and was not payable until a date postpetition, January 1, 2012. Therefore, his claim is equal to the value of his deferred compensation claim as of the filing of the petition, September 30, 2011. The Court finds the facts of this case do not require a determination of the present value of his claim due to the petition date occurring approximately 90 days before the payment date.[65]

The closest value the Court has for the value of the claim as of the petition date is $170,155.24, which is the value of the Trust assets as of October 1, 2011, the day after the petition date. The Debtor argues that Nguyen should only be entitled to the amount it received after liquidating the Trust or $168,891.80, after deduction of the administrative costs of liquidation. The Court rejects this argument for two reasons. First, the $170,155.24 value is more faithful to the "value as of the petition date" approach—the deduction of administrative costs did not occur until after the petition date. The logic that supports ignoring the post-petition

---

[64] The Court finds it unnecessary to reach Nguyen's arguments about the propriety of the Debtor recovering the Trust assets. The propriety of the Debtor's actions is not before the Court, and as the Court has determined, even if the Debtor was wrong to liquidate the Trust assets in the fashion it did, the liquidation would not have affected the valuation of Nguyen's claim.

[65] The parties did not present evidence of present value and did not raise the issue in their briefs. At any rate, the difference between the face value of Nguyen's claim and its present discounted value (from January 1, 2012 to September 30, 2011) would be a de minimis difference. Other courts have taken a similar, practical approach in these circumstances. In Merry-Go-Round, the Court accepted and considered evidence of present value and went with a value that was four months off from the present value of the claim on the petition date—simply because that was the effective date of the expert's report. See Merry-Go-Round, 1999 WL 33457180, at *7.

administrative costs of liquidating the Trust is the same as that which supports rejection of Nguyen's argument regarding hypothetical post-petition value increases.  Second, § 9 of the Trust states that "the Company shall pay all administrative and Trustee fees and expenses." Accordingly, the Trust requires the Debtor and not Nguyen to bear the administrative costs.

Accordingly, for the reasons set forth above, the Court finds that Nguyen is allowed a general, unsecured claim in the amount of $170,155.24 for deferred compensation.

C.    Tax Damages Claim

The final element of Nguyen's claim relates to damages he alleges Ezenia caused him when it failed to withhold the correct amount from his paychecks.  The facts relating to this element are fairly straightforward.  Nguyen testified that for tax years 2007 and 2008, Ezenia withheld the incorrect amount from his paychecks, causing him to pay less federal income tax than the IRS eventually determined he owed.  Nguyen further testified that he was forced to not only pay the principal amount of the tax, but also interest.  He also had to pay a personal accountant to straighten things out with the IRS.  Nguyen submitted some documentary evidence to support the amount of the interest payments and accountant's fees.  These charges add up to $5,538.35 for interest and $2,000 for accountant's fees.[66]

As legal support for this element of his claim, Nguyen has cited various provisions of the Internal Revenue Code.  For example, Nguyen cites Treasury Regulation § 31.6205-1(c)(2), which requires an employer to file an adjusted return with the IRS in certain situations involving an underpayment of an employee's tax.  Nguyen claims that Ezenia failed to file an adjusted

---

[66] Exs. 325 (5/30/2011 email from Nguyen to McCann discussing tax damages claim), 326 (letter from Nguyen's accountant summarizing the cost of his services), and 327 (spreadsheet showing interest paid on late taxes).

return, and had it done so he would not have owed interest or incurred accounting fees. The Debtor counters, arguing that 26 U.S.C. § 3403 immunizes it from liability for the amount of the tax.

While both Nguyen and the Debtor may be correct in their interpretation of the legal sources they each cite to, the Court finds that those sources have no bearing on the validity of Nguyen's proof of claim. The reason for this is simple. Nguyen has not cited to anything in the Internal Revenue Code, the Bankruptcy Code, or any agreement or applicable non-bankruptcy law that would give him a claim against the Debtor for the damages he seeks. In the absence of a federal cause of action, the Court would ordinarily look to state law, but Nguyen has not cited any state law to support his position. After twenty days of trial, the Court should not be left guessing as to what the legal basis of Nguyen's claim is on any of its elements. Accordingly, the Court finds that Nguyen has not met his burden of proof on the tax damages element of his proof of claim and shall disallow that portion of his claim in its entirety. See 11 U.S.C. § 502(b).

## IV. SANCTIONS MOTIONS

The Court must now address the cross-sanctions motions the Debtor and Nguyen have filed against one another. There are three sanctions motions before the Court. First, Ezenia's motion against Nguyen seeks sanctions for (1) Nguyen's mass-deletion of emails and shredding of documents related to this litigation, just prior to his resignation and (2) Nguyen's unexplained, total failure to produce and delay in producing certain key-emails during discovery (Doc. No. 26) ("Ezenia Sanctions Motion"). Second, Nguyen's motion claiming that Ezenia intentionally

destroyed IWS data containing intra-company communications that would have been vital to Nguyen's defense of his proof of claim (Doc. No. 68) ("Nguyen Sanctions Motion").  Nguyen also seeks sanctions in this motion for the Debtor's allegedly reckless destruction of its servers before moving its company offices from New Hampshire to Washington, again depriving Nguyen of essential discoverable information.  Third, is a motion where Nguyen seeks sanctions against Ezenia for its CEO's refusing to answer a deposition question during discovery (Doc. No. 86) (the "Deposition Sanctions Motion").

    A.    <u>The Ezenia Sanctions Motion</u>

The facts relating to the Ezenia Sanctions Motion intertwine with the general series of events leading up to Nguyen's resignation from Ezenia.  But, certain relevant events did not take place until after the filing of Ezenia's bankruptcy case or after this adversary proceeding had begun.  So, for the sake of clarity, the Court shall briefly summarize most of the material, relevant facts relating to the Ezenia Sanctions Motion in one place.  These facts are drawn from the testimony of various witnesses and exhibits admitted into evidence.

Nguyen resigned on June 8, 2011.  He acknowledges that in the weeks leading up to his resignation and on his last day, he deleted most of the emails that were contained in his official Ezenia email account.[67]  Nguyen explained these deletions by saying that he did not want to become "contaminated" with Ezenia's proprietary information after his departure.  Nguyen further explained that he did not believe deleting emails from his personal computer would permanently remove the emails from Ezenia's email server.  Ezenia presented testimony of one of

---

[67] His official Ezenia email account is distinguished from a "personal" Gmail account, which Nguyen also used in conducting company business.  Ezenia has never had direct access to Nguyen's Gmail account, insofar as this Court is aware.

its information technology employees and a computer forensic expert to help explain the details

surrounding the email deletions.  In this testimony, these witnesses compared the number of

emails on the most recent backup Ezenia still retains of Nguyen's email account, performed on

April 26, 2011, with the number of emails in Nguyen's account on the day he resigned.  This

comparison resulted in an estimate that Nguyen deleted about 55,000 emails during the weeks

between April 26 and June 8, 2011.

The Debtor also presented evidence that tended to discredit Nguyen's account of how

Ezenia's email system worked.  An Ezenia employee who worked with the email server during

the relevant time period testified that the Ezenia server was set up to mirror the local copy on an

employee's personal computer—any changes made on the personal computer's email client

would be synced to the server as soon as the email client on the personal computer was able to

connect to the Ezenia server.  Most of the time, this synchronization would occur virtually in real-

time and would only be delayed significantly if the end-user was using his email client on his

personal computer while not connected to the Ezenia network.  Essentially, this meant that if an

email was deleted on an individual's computer, it would be deleted from the server as well.[68]

Despite Ngyuen's deletions, Ezenia was able to recover most of his emails from a backup

copy, which had been prepared at Nguyen's request—not one of the backups Ezenia's staff

performed in the ordinary course.  Certain emails were, however, irrecoverable because they had

---

[68] Specifically, the testimony was that when a user deletes an email, the email is moved into a recycle bin folder, which was also mirrored on the Ezenia email server.  Every thirty days this recycle bin folder was purged, permanently destroying the contents—both on the server and on the local computer.  The practical take away is that any emails an employee deleted were permanently destroyed every thirty days, unless a separate backup was done in the interim.  Once Ezenia learned that Nguyen had deleted his emails, it was already too late to recover them; they had already been purged.

not been backed up.  According to the testimony of Ezenia's expert witness, no emails were recovered between the end of April and Nguyen's resignation on June 8—because no backups were performed for this period before the emails were purged from the recycle bin folder on the server.  The result is that no emails of Nguyen's exist in the Debtor's email system for this period of time, and Ezenia had to track down the contents of these emails by searching the email of other employees and officers, a much more laborious task and one that did not guarantee success. According to the Debtor's expert, there are two other periods for which Ezenia was missing all of Nguyen's emails—June 18, 2010 to August 15, 2010 and November 10, 2010 to January 2, 2011. There was no specific evidence or explanation provided by either side for what happened to these emails.

Finally, Ezenia employee, Rock Roll, testified that in addition to deleting emails, Nguyen shredded an office full of documents before he stopped coming into the office.  Mr. Roll testified that Nguyen's office was perpetually filled with stacks of paper documents while Nguyen was working and active at Ezenia, up until the end of April 2011.  One night during that month, Roll testified that while working late, he heard the sound of a shredder "laboring behind closed doors." In the morning, all the documents were gone from Nguyen's office and a number of large trash bags filled with what looked like shredded paper had been placed outside the office in the hallway.  Snyder, then a director, testified that when he arrived at Ezenia's headquarters in May 2011, Nguyen's office was completely empty.

In addition to deleting emails and shredding physical documents, there is evidence that Nguyen was intentionally concealing information from Ezenia during his last months of employment.  The first example of such an intention is displayed in a March 2011 email from

Nguyen to Janke. This email was precipitated by an email the outside directors had accidentally sent to one of Nguyen's subordinates, who forwarded the email to Nguyen. Nguyen, reflecting on the outsides directors' mistake, said:

> "Given their faux pas, it is all the more incumbent on us to double check our distribution list before we send anything out. Let's use our personal address as much as we can."[69]

In another email to Janke, Nguyen also showed an awareness of what information was being passed into Ezenia's records. In response to an email from Janke concerning the potential ArX merger, Nguyen makes the suggestion, "Let's use your other channel"—referring to using a different, non-Ezenia email address.[70] Finally, Nguyen sent at least one email containing the following text: "FOR YOUR EYES AND EARS ONLY! READ AND DELETE!"[71] This email was directed to Ezenia employees and concerned major issues in this proceeding, namely the composition of the Board of directors and the role of the outside directors at the company.

Finally, the Debtor presented evidence of Nguyen's post-litigation discovery misconduct. This misconduct came in two forms: first, not producing certain key documents at all; and, second, delaying in the production of virtually all electronic documents in his possession. This evidence came in the form of testimony from one of the Debtor's attorneys who assisted the Debtor during the discovery process. In response to Ezenia's first request for the production of documents, Nguyen did not produce any electronically stored documents, claiming that Ezenia already had those documents. When Nguyen testified at the sanction hearings in November 2013,

---

[69] Ex. 48, 3/17/2011 email.

[70] Ex. 51, 3/31/2011 email from Nguyen to Janke.

[71] Ex. 47, 3/3/2011 email from Nguyen to Keith Barron and Michael Fitzell.

he asserted that he did not produce electronic documents, such as emails, at that time because he thought the request only pertained to physical documents.  However, Nguyen's responses to the document request, are prefaced by the statement that all "responsive non-privileged 'documents' as the term is commonly understood, including electronically stored documents" had been produced.[72]

The Debtor's attorney also testified about what documents Nguyen did not produce, emails which Nguyen had authored that must have been in his possession at one time.  The Debtor knew of the existence of these documents because they had been obtained from a source other than Nguyen.  This testimony revealed that communications contained in Exhibits 5, 6, 7, and 48 were never produced by Nguyen.

In order for a Court to find that sanctionable spoliation has occurred, three conditions must be satisfied.  First, there must be evidence of actual destruction of documents.  Second, the party responsible for the documentary destruction must have been on notice of both the potential for litigation, and, third, of the potential relevance of the destroyed documents to  any possible litigation.  See Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 399 (1st Cir. 2012) (citing Testa v. Wal-Mart Stores, Inc., 144 F.3d 173, 177 (1st Cir. 1998)); Booker v. Massachusetts Dept. of Public Health, 612 F.3d 34, 45-46 (1st Cir. 2010).  Once a Court is satisfied that evidence has been despoiled, a range of sanctions are available including dismissal, exclusion of evidence, a negative inference, and monetary sanctions.  See American Health Inc. v. Chevere, 37 F. Supp. 3d 561, 565 (D.P.R. 2014).  The power of the Court to sanction spoliation derives not from a statute or rule but from the inherent power of the Court to manage its own affairs.  See id. (citing

---

[72] Ex. 2, Def. Answers and Responses to Debtor's Mediation Discovery Requests.

Jimenez-Sanchez v. Caribbean Restaurants, LLC, F. Supp. 2d 140, 143 (D.P.R. 2007); see also

Charbono v. Sumski (In re Charbono), 790 F.3d 80, 85-86 (1st Cir. 2015) ("[C]ourts may levy

sanctions (including punitive sanctions) for such varied purposes as disciplining attorneys,

remedying fraud on the court, and preventing the disruption of ongoing proceedings.")

    The Court finds that Nguyen's conduct—deleting emails, shredding documents, delaying

the discovery process, and inexplicably failing to produce other evidence—to be egregious and in

bad faith.[73]  All of this conduct more than satisfies the standard for spoliation or is otherwise

sanctionable.

### (i) Destruction of Emails

    Nguyen admits he deleted thousands of emails from his email client on his personal

computer in the weeks before he resigned on June 8, 2011.  Ezenia confirmed these deletions by

engaging an expert and having its own personnel examine a backup of Nguyen's email account

and compare the content of that backup to the information still existing in Nguyen's email

account.  All the parties agree that Nguyen's email account contains about 55,000 fewer emails

than the backup.  The Court does not need to go further to determine that Nguyen deleted and

---

[73] The First Circuit Court of Appeals has not unambiguously articulated whether a finding of bad faith is a necessary condition for a trial court to impose sanctions for spoliation.  Compare Trull v. Volkswagen of America, Inc., 187 F.3d 88, 95 (1st Cir. 1999) ("Our case law does not require bad faith or comparable bad motive. 'Bad faith is not essential. If such evidence is mishandled through carelessness, and the other side is prejudiced, we think that the district court is entitled to consider imposing sanctions, including exclusion of the evidence.'") (quoting Sacramona v. Bridgestone/Firestone, Inc., 106 F.3d 444, 447 (1st Cir. 1997)) with United States v. Laurent, 607 F.3d 895, 902 (1st Cir. 2010) ("In general, the [adverse inference] instruction usually makes sense only where the evidence permits a finding of bad faith destruction; ordinarily negligent destruction would not support the logical inference that the evidence was favorable to the defendant. . . . But the case law is not uniform in the culpability needed for the instruction.") (emphasis in original).  Because the Court finds bad faith here, it is not necessary to address any potential ambiguity.

destroyed evidence—satisfying the first spoliation factor.  But, Nguyen has raised several arguments against this straightforward and logical reasoning, which the Court shall address.

Nguyen's arguments fall into two groups.  First, he argues that he did not intentionally delete anything, but rather misunderstood how the email system worked.  Second, he argues that it was Ezenia's fault that he was able to delete or destroy any emails and that the Debtor itself is to blame.  If furtherance of his first arguments, Nguyen gave detailed testimony as to how he believed the email system at Ezenia worked.  According to Nguyen's testimony, it was essentially impossible to actually delete anything; the Ezenia email server would save all files regardless of whether a user deleted the email from the hard disk on his personal computer.  Nguyen professed a belief that Ezenia's email server contained a record of all emails sent, received, and deleted by all employees.  Ezenia presented testimony to refute Nguyen's professed understanding.  An Ezenia employee testified that while the system could conceivably have been set up that way, it was not. The way the system actually worked was that the email server and local copy on someone's computer were mirrored copies, with the recycle bin, or "dumpster" of deleted emails being purged every 30 days.

The Court does not credit Nguyen's testimony, given his own actions, and apparent knowledge and technical background.  Nguyen was deeply involved in all the operations of Ezenia for more than a decade.  The company specialized in secure communications software and Nguyen himself has a degree in computer science.  Given Nguyen's detailed long-term involvement in the company's operations, procedures, and his technical background, the Court does not find it credible that Nguyen did not know how the email system functioned in terms of saving mail—this is especially true given the attention Nguyen afforded creating backups of

email.  If Nguyen truly believed that the email server was saving every email, even emails that users deleted off their personal computers, then he would not have needed to request special backups be made.  Also, there is the email where Nguyen directed two of his employees to read and then delete his email to them.  Nguyen would not have given this direction if he believed the email would be retained in any event, regardless of whether the email was deleted by an employee.

Further, there are multiple communications in which Nguyen professed to be "cleaning out" his email. Again, if nothing could be deleted, the Court infers that this cleaning would have been a waste of time.  For example, in a April 26, 2011 email from Nguyen to Janke and Nguyen's personal attorney, Brian West, Nguyen states—in the context of a discussion about the preparation of his resignation letter—that "I will need tomorrow the whole day to clean out my mail box."[74]  The Court notes that this email was sent on the same day the April 26, 2011 email backup was made.  A second email, sent on May 4, 2011 from Nguyen to a friend, shows that Nguyen was still cleaning out his email days later.  In this email, Nguyen refers to "cleaning out my e-mail today, in anticipation of my departure from Ezenia."[75]  In testimony, Nguyen stated that it was standard procedure for employees to clean out their email, deleting old and irrelevant emails.  While this may be the case, it supports the Court's inference that Nguyen believed it was possible to delete emails, contrary to his earlier testimony concerning his belief in the workings of Ezenia's email server.

---

[74] Ex. 1146, 4/26/2011 email.

[75] Ex. 1154, 5/4/2011 email.

The Court also does not credit Nguyen's professed motivation for deleting his emails. The evidence showed that Nguyen often forwarded emails to his personal Gmail account relating to Ezenia's business. Indeed, Mr. Roll and Ezenia's forensics expert testified that Nguyen forwarded around 200 emails from his Ezenia account to his personal Gmail account just prior to his resignation. In addition, the Court has observed that many of the emails entered into evidence in this case were sent from or forwarded to Nguyen's personal account. It appears that Nguyen was using his personal account almost interchangeably with his Ezenia account. Nguyen stated that he deleted his Ezenia emails because he wanted to avoid "contamination," which the Court understands to mean potential claims that Nguyen took proprietary Ezenia information with him when he resigned. All of the forwarding of emails to his personal Gmail account belies Nguyen's avoidance of contamination argument. At no time did Nguyen or any other witness testify that Nguyen went through the same cleaning out process with his personal account. Indeed, the continued existence of many company-related emails from Nguyen's personal email account indicates that he did not purge company communications from his personal email files. Nguyen's actions are not consistent with his explanation; had he gone through a similar clean-out process with his personal email, the Court would have more cause to credit his justification for deleting the emails in his work account. As the evidence stands, Nguyen's justification for his email deletion simply is not credible

Nguyen's second group of arguments—that Ezenia was responsible for the email deletions—do not withstand even slight scrutiny. Nguyen argues that the email system should not have been set up in a way that allowed users to delete emails and that it was the responsibility of Ezenia's IT Administrator to set the policy that purges the deleted items folder every 30 days. In

effect, Nguyen argues that he is not responsible for certain emails being permanently deleted because he did not personally purge his deleted items folder.  Nguyen's argument is akin to blaming a sanitation worker for taking the trash to a landfill rather than the person who actually threw the trash into the trash can.  Nguyen was the one who, at his own discretion, caused his email to be put into a folder of items marked for deletion.  Accordingly, he is responsible for those acts.

Nguyen also argues that emails were not destroyed and claims that Ezenia is working a fraud upon the Court by advancing such a theory.  Nguyen points to the April 26, 2011 backup of his emails, claiming that he is the only reason the Debtor has any of his emails, and rather than seeking a sanction from him, the Debtor should be thankful that he asked for this special backup.  Nguyen oversimplifies and mischaracterizes the Debtor's position.  Ezenia has acknowledged all along that it retained most of the emails Nguyen deleted in a backup that Nguyen himself caused to be created.  There are, however, gaps in this backup.  The most important gap exists after the backup was created—the critical period between April 26, 2011 and June 6, 2011.  The Debtor argues that Nguyen deleted all of his emails.  That the emails were retained elsewhere is beside the point; the existence of the backup goes toward whether the Debtor was prejudiced than whether emails were actually deleted.  The Court finds that emails were indeed destroyed and that the first element required to find spoliation is satisfied.

The next element of spoliation—being on notice of pending or possible litigation—is also satisfied.  From the evidence on hand and testimony at trial, Nguyen was on notice of possible litigation at least as early as March 17, 2011.  On this date, Nguyen sent an email to Janke discussing legal preparations the two were making.  Nguyen asked Janke, "Have you had a

chance to close the loop with Brian? Should we have a conference call with Brian in the near future in anticipation and preparation of what our next step should be?"[76]   Nguyen's testimony at trial confirmed that the "Brian" referred to in this email was indeed Brian West, Nguyen's personal attorney.  Accordingly, it appears that Nguyen was contemplating some type of legal step in mid March 2011.  From that point on he had an affirmative duty to preserve potentially relevant evidence.[77]

The third element of spoliation, which is the relevance of the destroyed documents to pending or potential litigation, is likewise satisfied.  Nguyen deleted virtually all of his email in the weeks before he departed.  Many of those emails are now exhibits in this litigation.  The unrecovered emails, especially emails after April 26, 2011, would almost necessarily have been relevant to this case because they would have helped shed light on what, if anything, Nguyen was working on for Ezenia after he started the process of resigning.  This period was the subject of much of the trial.  The availability of email records documenting his work during this period likely would have simplified and shortened the trial, if those emails had been preserved.

Accordingly, the Court finds that Nguyen intentionally destroyed relevant emails in anticipation of litigation.  The Court shall address what sanction is appropriate after reviewing the balance of Nguyen's conduct.

*(ii)  Shredding of Paper Documents*

---

[76] Ex. 48, 3/17/2011 email.

[77] The Debtor has argued that Nguyen's duty to preserve was triggered much earlier.  It cites a May 27, 2010 email, which Nguyen sent to among others, Brian West.  See Ex. 20.  It is unclear to the Court that Nguyen was seeking legal advice in this email.  Further, since the email deletions occurred after April 2011, it does not appear to make any difference; at the time Nguyen deleted his emails, he was unquestionably on notice of the potential for litigation.

The evidence that Nguyen shredded paper documents that were in his office comes from two sources: the testimony of Rock Roll, an Ezenia employee, who at the time worked at a desk in view of Nguyen's office, and the testimony of Larry Snyder, at the time an outside director who came to Ezenia in mid-May 2011 and observed that Nguyen's office was completely devoid of paper documents.  Nguyen simply denies shredding any documents and argues to the extent that he disposed of any documents, they had nothing to do with the claims in this case.  After considering the testimony in light of the circumstances that were ongoing at the time, the Court concludes that Nguyen did despoil the paper documents in his office.

There exists persuasive evidence that Nguyen (1) habitually kept a large number of paper documents in his office right up until the time he was departing Ezenia at the end of April 2011 and (2) that these documents were disposed of before his departure.  Nguyen made much of the fact that Mr. Roll did not actually see him shredding documents, only that he heard it going on. After listening to Mr. Roll's testimony, however, the Court is convinced that Nguyen shredded most of the contents of his office.  Roll worked in an office where multiple shredders were used. The Court credits his ability to know what a shredder sounds like.  Second, Roll observed bags of shredded paper outside Nguyen's office the next day and that Nguyen's office was empty of papers. The vacant condition of Nguyen's office was confirmed by Snyder around the same time. Finally, shredding documents is consistent with Nguyen's behavior in deleting his emails.

Based on this evidence, the Court finds that Nguyen (1) destroyed numerous documents, (2) that Nguyen did so while on notice that litigation was likely—this was going on at the time that Nguyen was negotiating the terms of his departure from Ezenia, late April 2011—and (3) that the documents destroyed were potentially relevant to the litigation.  It does not take much for the

62

Court to infer that some, if not many, of the documents in Nguyen's office would likely have been relevant. The Court notes that the threshold for relevance, at least as all of the parties apparently viewed it, was extremely low based on the extraordinary number and breadth of content of the exhibits they admitted at trial. The documents that Nguyen disposed of would likely have given a clue as to what work he was doing before he departed and his relationship with former President Janke. Again, these were key areas of controversy in this case and even superficially unrelated documents might have helped shed light on a complex factual situation. The Court shall address an appropriate sanction below.

### (iii) Post-Litigation Conduct

The Ezenia Sanctions Motion touches on two different facets of Nguyen's post-litigation conduct. First, Nguyen delayed in producing electronic discovery, and, second, did not produce certain key emails of which he must have been in possession of. Normally, a mere delay in producing discovery without a motion to compel and violation of a resulting court order is not sanctionable, whereas a total failure is sanctionable without a motion to compel. <u>Compare</u> Fed. R. Civ. P. 37(b) (discussing sanctions for failure to comply with a court order) <u>with</u> Fed. R. Civ. P. 37(d) (covering a total failure to respond to discovery requests). Here, Nguyen eventually did produce electronic discovery and there was no Court order. However, given the rest of Nguyen's conduct, the Court will consider this delay as part of the overall conduct that Nguyen displayed in regard to this litigation.

Much more important than Nguyen's delay in providing electronic discovery is his unexplained failure to produce certain emails. Nguyen did not produce Exs. 5, 6, 7, and 48. Nguyen does not claim to have deleted these emails and testified that he did not know why he did

63

not produce them.  The Court finds this lack of production disturbing.  Exhibits 6, 7, and 48 in particular ended up being highly material and probative in this Court's decision with regard to Nguyen's claim for severance benefits.  See supra at § III(A)(i). Without access to this information, the case may have turned out differently.  Exhibit 7 in particular demonstrates the extent to which Nguyen ceded his role to Janke.  Exhibit 48 played a key role in this sanctions decision as it is the earliest evidence of when Nguyen began planning his legal action.

Given the rest of Nguyen's conduct, the Court does not believe it was a coincidence that Nguyen did not produce these exhibits.  And, in the absence of a reasonable explanation as to why they were not produced, the Court believes such a failure constitutes bad faith and is independently sanctionable.  The Court bases this decision additionally on the emails that show Nguyen was actively trying to hide information from Ezenia by encouraging Janke to communicate outside of the regular Ezenia email system.[78]  Notably, all of  Nguyen's emails contained in the exhibits he did not produce originated from his personal Gmail account.[79]  They do not appear to be emails he forwarded himself from his Ezenia account.  This is consistent with Nguyen's methodology of using his personal account to send emails that he did not want Ezenia to retain.  The Court considers this evidence of Nguyen's overall pattern of attempting to keep certain information from Ezenia, and in turn from the Court.

*(iv)  Sanctions*

---

[78] See, e.g., Exs. 51 (3/31/2011 email) and 48 (3/17/2011 email).

[79]  See Exhibits 5, 6, 7, and 48.  At trial, several different witnesses testified that emails from "KHOA NGUYEN" in all caps, as distinguished from "Khoa Nguyen," only with initial caps indicates that the email originated from Nguyen's personal Gmail account, with the address of ngdakhldnh@gmail.com.  The actual Gmail address is sometimes in the email header and sometimes not.  Compare Ex. 7 with Ex. 6.

The First Circuit Court of Appeals has endorsed a multi-factor test to be used in determining the type of sanction for discovery abuses.  See Vallejo v. Santini-Padilla, 607 F.3d 1, 8 (1st Cir. 2010).  The test includes both substantive and procedural factors and was developed to address situations where the trial court contemplated "severe sanctions" such as default judgment and dismissal with prejudice.  Id.  The Court shall apply this test, given both the severity and different forms of Nguyen's misconduct.  First, two procedural factors bear consideration: (1) notice to the party to be sanctioned and (2) opportunity for argument.  Angiodynamics, Inc. v. Biolitec AG, 991 F. Supp. 2d 283, 290 (D. Mass. 2014).  Here, both of these procedural factors are more than satisfied.  The Ezenia Sanctions Motion was rolled into the trial on the complaint. Both sides accordingly had the full benefit of presenting extended evidence and argument to support their positions.  Additionally, the Court held a full evidentiary hearing on the Ezenia Sanctions Motion before the trial began.

Second, the substantive factor test:

(1) the severity of the violation
(2) the legitimacy of the party's excuse for failing to comply
(3) whether the violations were repeated
(4) the deliberateness of the misconduct
(5) any mitigating excuses
(6) prejudice to the other side and to the operations of the court
(7) the adequacy of lesser sanctions

<u>Vallejo</u>, 607 F.3d at 8.[80]  These factors help trial courts "determine whether the twin goals,

punishment and deterrence, justify a particular sanction in a specific factual context."

<u>Angiodynamics</u>, 991 F. Supp. 2d at 290.  These factors are particularly helpful in the context of

spoliation where "the severity of a sanction may, depending on the circumstances of the case,

correspond to the party's fault."  <u>Adkins v. Wolever</u>, 554 F.3d 650, 652-53 (6th Cir. 2009).

 As the Court stated previously, it considers the violations described above to be severe.

When taken together, Nguyen's actions appear part of a larger course of conduct designed to keep

certain evidence from the Debtor.  This also goes to factor (4), the deliberateness of the

misconduct.  The Court finds that all of Nguyen's conduct was deliberate.  The Court did not find

any of Nguyen's excuses to be legitimate, for the reasons discussed above.  Nguyen's actions

were repeated both in the sense that he destroyed many documents over a period of weeks and in

the sense that his misconduct took various forms, both before and during this litigation.  The

Court does not find that any mitigating excuses exist.

Prejudice to Ezenia is a complex issue.  There is no question that Ezenia was prejudiced.

But for Nguyen's sanctionable conduct, the Debtor would not have needed to bring a sanctions

motion and would not have needed to employ a forensics expert.  It is also likely that discovery

---

[80] The other Courts of Appeals have similar guidelines in the context of sanctions for spoliation.  <u>See, e.g.</u>, <u>Schmid v. Milwaukee Elec. Tool Corp.</u>, 13 F.3d 76, 79 (3d Cir. 1994) ("the key considerations in determining whether such a sanction is appropriate should be: (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future."); <u>Silvestri v. General Motors Corp.</u>, 271 F.3d 583, 590 (4th Cir. 2001) ("While a district court has broad discretion in choosing an appropriate sanction for spoliation, the applicable sanction should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine.") (quotation omitted).

would have been simplified; the Debtor would have had immediate access to all of Nguyen's email without having to go through a backup and would not have needed to seek discovery through other parties to track down emails Nguyen sent to them.  Nguyen's conduct necessitated the Debtor incurring thousands of dollars in attorney time and other costs.  However, given the voluminous record the Debtor created in this case, it would be difficult to identify particular costs solely attributable to Nguyen's conduct based on the evidence presented without yet more arguments and expense.

The trial was not conducted in an especially efficient manner, which unnecessarily added to the costs described above.  Much of the evidence and testimony was cumulative and not especially probative, and no issue was too small for the parties to refrain from filing lengthy briefs or conducting extensive cross-examination.  The Court considers both sides, Nguyen and the Debtor, to be equally responsible for these inefficiencies.  Undoubtedly, such inefficiencies are the inevitable byproduct of a rancorous and emotional dispute, and the Court makes note of them, not to chastise counsel for the parties, but only to make the point that any award of attorney's fees as a sanction could involve contentious and difficult issues caused by the mutual conduct of the parties.

Finally, the Court must consider the adequacy of lesser sanctions when it comes to the ultimate conclusion of what sanction is appropriate.  Here, the situation is unusual.  Most of the time a sanctions motion is decided before the conclusion of a trial.  Because the Court has concluded the trial on the merits and come to a decision against Nguyen on the major issue of the change in status, any adverse inference or default judgment is not appropriate—or necessary.  The decision not to impose either of these remedies is not born from the severity or lack thereof of

Nguyen's misconduct.  After one pre-trial evidentiary hearing on the Ezenia Sanctions Motion, it was far from clear what evidence might be missing and what prejudice any party had suffered. Ultimately, the Court was able to reach a decision on the merits both because sufficient evidence existed to do so and because the Court and parties spent twenty days of trial time generating an evidentiary record to make such a decision possible.  The decision was further guided by the principle that courts prefer to decide matters on the merits, rather than imposing a default judgment sanction.  See Zeitler v. Zeitler (In re Zeitler), 221 B.R. 934, 937 (B.A.P. 1st Cir. 1998) (noting the preference of courts for "disposing of cases on their merits").  Under these circumstances, the appropriate course is a monetary sanction requiring Nguyen to pay a portion of the Debtor's attorney's fees.  The use of the inherent power of the Court to impose a fee-shifting sanction "should be used sparingly and reserved for egregious circumstances." Jones v. Winnepesaukee Realty, 990 F.2d 1, 4 (1st Cir. 1993);  see also Leon v. IDX Sys. Corp., 464 F.3d 951, 961 (9th Cir. 2006) (attorney fee award may be appropriate where the party acted wantonly and in bad faith).  As the Court articulated above, these circumstances fit that bill.

As partial compensation to the Debtor for fees incurred solely due to the sanction motions, and as a sanction on Nguyen to deter such conduct by future litigants, the Court shall impose a sanction determined by reference to, but not measured by, the attorneys fees incurred preparing for and attending the pretrial sanction hearings and the trial time spent on the sanctions evidence. The detailed time records[81] submitted by the Debtor in connection with its final fee request for its counsel reflect the following charges for attorney's fees in connection with hearings on the sanctions motions on the dates indicated:

---

[81] See dates indicated in Ex. A to Bankr. Doc. No. 593.

| | | | | |
|---|---|---|---|---|
| November 20, 2013 | CRH | $ 6,028.00 | 100% | $ 6,028.00 |
| November 20, 2013 | JM | $ 134.00 | 100% | $ 134.00 |
| November 21, 2013 | CRH | $ 5,000.50 | 100% | $ 5,000.50 |
| November 21, 2013 | CRB | $ 368.50 | 100% | $ 368.50 |
| November 21, 2013 | JM | $ 2,211.00 | 100% | $ 2,211.00 |
| January 22, 2014 | CRH | $6,507.50 | 100% | $6,507.50 |
| January 22, 2014 | JM | $3,048.50 | 100% | $3,048.50 |
| January 23, 2014 | CRH | $6,302.00 | 100% | $6,302.00 |
| January 23, 2014 | JM | $3,383.50 | 100% | $3,383.50 |
| January 24, 2014 | CRH | $ 6,096.50 | 20% | $ 1,219.30 |
| January 24, 2014 | JM | $ 1,474.00 | 20% | $ 294.80 |
| June 30, 2013 | JM | $ 2,512.50 | 100% | $ 2,512.50 |
| July 1, 2014 | CRH | $ 3,767.50 | 100% | $ 3,767.50 |
| July 1, 2014 | JM | $ 1,742 | 100% | $ 1,742 |
| | | Total Fees Incurred | | $42,519.60 |

The number above is by no means an exact measure of fees incurred by Ezenia in dealing with

Nguyen's spoliation and failure to produce.  However, it provides a rough guide to the fees

directly incurred in connection with the sanctions matter.  The Court understands that Ezenia may

believe that the number above grossly underestimates its expense.  However, precision is not the

Court's goal in establishing a sanction.  The goal is partial compensation and deterrence.  See

Trull, 187 F.3d at 95; Adkins, 554 F.3d at 652 ("[A] proper spoliation sanction should serve both

fairness and punitive functions.").  Accordingly, the Court determines the amount of the monetary

sanction imposed on Nguyen shall be $45,000.00, which may be collected by the Debtor as an offset against any claim paid to Nguyen.

B.     Nguyen Sanctions Motion and the Deposition Sanctions Motion

(i) IWS Data Loss

Nguyen seeks sanctions against the Debtor for the Debtor's loss of IWS data. In July 2011, after Nguyen resigned, Ezenia suffered a server malfunction in which certain IWS data was irretrievably lost. Specifically, Nguyen points to the loss of the IWS chat-log data from between January 2011 to July 2011 as sanctionable. Nguyen's claim is that Ezenia's then-new management, Chairman Kidston and CEO Snyder, intentionally destroyed the IWS chat-logs in a "nefarious" scheme to deprive Nguyen the use of the chat logs in litigation.

Various current and former Ezenia employees testified about the use of the IWS chat feature at Ezenia. It is a secure chat system, in which users can communicate via a text. Nguyen testified that he would require employees to use the IWS chat system to increase their familiarity with the product they were selling. Nguyen argues that Ezenia employees necessarily would have used the chat system to discuss the actions of the outside directors during the period from January 2011 through Nguyen's resignation. At least one former Ezenia employee, Keith Barron, testified that he did in fact have conversations about this topic with other Ezenia employees during the relevant period. However, there is no evidence that either Nguyen or any of the outside directors ever used IWS chat during the relevant period. So, some possibly relevant information was lost, but it is not likely to be highly material since none of the major players in this litigation appear to have used the IWS chat feature during the relevant time period.

Even if the data lost was relevant, the occurrence is not sanctionable.  There is not a single quantum of evidence that would indicate that the loss of data was anything other than a technical malfunction occurring in the ordinary course, specifically excused by Federal Rule of Civil Procedure 37(e).[82]  Nguyen seems to argue that Ezenia has the burden to prove that the data loss was not intentional and sanctionable.  In other words, Nguyen argues that the law presumes any loss of electronically stored information is "nefarious" and that the party opposing the sanctions motion has the burden to rebut this presumption.  This is not a correct statement of the law.  Contrary to Nguyen's assertion, the party seeking a sanction for spoliation "must lay an evidentiary foundation," which Nguyen has not done here.  Booker, 612 F.3d at 45.

Nguyen's theory is also inconsistent with the law of spoliation, set out above.  Spoliation implies a knowing or voluntary act that causes the destruction.  It is based on "the commonsense observation that a party who destroys a document (or permits it to be destroyed) when facing litigation" does so to conceal relevant evidence that could hurt that party's position.  Id.  Destruction of information, as the byproduct of an accidental malfunction cannot be the basis for a finding of spoliation, absent some evidence that the destruction was achieved on purpose.  Accordingly, the Court shall deny this portion of Nguyen's request for sanctions.

*(ii)  Shredding of Servers*

Nguyen also asks the Court to sanction Ezenia over its destruction of servers in 2012.  In 2012, Ezenia had certain data servers destroyed before it moved its headquarters from Nashua, New Hampshire to Seattle, Washington.  Rock Roll is the only witness that testified about this

---

[82] Fed. R. Civ. P. 37(e) states: "Absent exceptional circumstances, a court may not impose sanctions under these rules on a party for failing to provide electronically stored information lost as a result of the routine, good-faith operation of an electronic information system."

event, but his testimony was in depth.  Roll testified that the server destruction was part of a routine business decision that it would be cheaper to move the data to a different storage medium and move the data to Seattle that way, rather than moving the servers—which were apparently outdated—across the country.  Further, Roll testified that the data on the servers was completely backed up before the servers were disposed of, although he did not have personal knowledge of the details of the backup process.

The destruction of these servers is not sanctionable for several reasons.  First, there was no evidence that any relevant data was actually destroyed.  Second, Ezenia's counsel stated that the data-backup was made available to Nguyen during discovery, who declined to examine it.  Third, Roll's testimony was that the data on the servers that were destroyed did not contain employee emails and that it was not the policy of Ezenia to store employee email on these servers.  Nguyen made much of Roll's testimony that it would have been theoretically possible for an employee to store emails on these servers, but that he was not aware of anyone having done so.  And, Nguyen did not supply any evidence of such a practice.  So, even if data was lost it is likely that the data lost was irrelevant to this litigation.

Ezenia's destruction of its servers is distinguishable from Nguyen's destruction of emails.  First, Nguyen did not do a complete backup of his email, as discussed above, so certain emails were irretrievable.  Second, Nguyen was not able to articulate a credible reason for the deleting of his emails.  Ezenia, on the other hand, has provided a credible and rational justification for the server destruction.  Third, Nguyen's actions prejudiced Ezenia, but there is no indication that Ezenia's server-shredding prejudiced Nguyen; case-in-point, Nguyen apparently did not think it

was worth it to even examine the information contained in the server backups when the opportunity was provided to him.

For all of these reasons the Court shall deny this portion of Nguyen's sanctions request.

### (iii) The Deposition Sanctions Motion

Finally, by separate motion, Nguyen is seeking sanctions for Larry Snyder's refusal to answer a deposition question.  In full the question was as follows:

> Q: Okay.  I'd like some clarification on the motion for sanctions issue that Ezenia! Has filed.  Is it fair to say that Ezenia!'s position is that the electronic records from April, May and up to June 8 of 2011 are vital to a proper determination by the judge in this case?

In response to this question, Ezenia's counsel objected and instructed Snyder not to answer.  The basis of the objection was vagueness and that it asked for a legal conclusion.  In its pleading responding to the sanctions motion, Ezenia raised its work-product privilege objection.

The Court does not find it necessary to determine whether the question was objectionable—even if the question was proper and Snyder improperly refused to answer, sanctions are not warranted.  Nguyen is seeking sanctions under Rules 30(d)(2) and 37.  See Fed. R. Civ. P. 30(d)(2) and 37.  Rule 30(d)(2) provides that the court "may impose an appropriate sanction" (emphasis added).  Rule 37 does not appear applicable.  Nguyen did not move to compel Snyder to answer the question, see Rule 37(a); Snyder did not violate a court order in refusing to answer; see Rule 37(b); and he did not "fail to attend" the deposition entirely, see Rule 37(d).

The Court has "considerable discretion" in deciding whether to award sanctions under Rule 30(d)(2).  Baker v. St. Paul Travelers Ins. Co., 670 F.3d 119, 122 (1st Cir. 2012).  Here, the Court shall not award sanctions because it does not appear that Nguyen was prejudiced by

Snyder's failure to answer.  The Court does not see what relevance Snyder's opinion on the subject of whether certain email records were "vital" to this Court's determination.  Further, Snyder spent more than a day on the witness stand during the trial.  A considerable amount of that time was spent answering questions regarding the emails referenced in the question.  So, the Court finds that any prejudice that followed was more than cured by the lengthy examination of Snyder at trial.  Accordingly, this sanctions request is denied.


## V.  CONCLUSION

For the reasons set forth in this opinion, the Court shall enter a separate order(s):

a)      sustaining the Debtor's objection to the claims for severance benefits and federal income tax damages, denying such claims in their entirety;

b)      Liquidating Nguyen's allowed claim for deferred compensation in the amount of $170,155.24;

c)      granting the Ezenia Sanctions Motion and awarding a monetary sanction in the amount of $45,000.00 against Nguyen; and

d)      denying the Nguyen Sanctions Motion and the Deposition Sanctions Motion.

This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

ENTERED at Manchester, New Hampshire.


Date:   August 28, 2015                    /s/ J. Michael Deasy
                                            J. Michael Deasy
                                            Bankruptcy Judge

74